LEWIS
AND
ROCA
——LLP——
L A W Y E R S

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169-5996
Facsimile No. (702) 949-8321
Telephone: (702) 949-8320

Susan M. Freeman AZ State Bar No. 004199 pro hac vice
Email: SFreeman@LRLaw.com
Rob Charles NV State Bar No. 006593
E-mail: RCharles@LRLaw.com

Attorneys for Petitioning Creditor USACM Liquidating Trust

Electronically filed 8/3/07

ORRICK, HERRINGTON &  SUTCLIFFE LLP
MARC A. LEVINSON (CA Bar No. 57613) pro hac vice
JEFFERY D. HERMANN (CA Bar No. 90445) pro hac vice
400 Capitol Mall
Sacramento, California  95814
Telephone:  (916) 447-9200
Facsimile:  (916) 329-4900
Email:   malevinson@orrick.com

Attorneys for Petitioning Creditor Post-Effective Date DTDF

BECKLEY SINGLETON, CHTD.
BOB L. OLSON (NV Bar No. 003783)
ANNE M. LORADITCH  (NV Bar No. 008164)
530 Las Vegas Boulevard South
Las Vegas, NV  89101
Telephone: (702) 385-3373
Facsimile: (702) 385-5024
Email:   bolson@beckleylaw.com
         aloraditch@beckleylaw.com

SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
Michael H. Ahrens (CA 44766, pro hac vice)
-and-
BULLIVANT HOUSER BAILEY PC
Georganne W. Bradley (NV 1105)
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
Telephone: (702) 669-3600
Facsimile: (702) 650-2995
Email: georganne.bradley@bullivant.com

Attorneys for Petitioning Creditors Compass Financial
Partners LLC and Compass USA SPE LLC

GREENBERG TRAURIG, LLP
Keriann M. Atencio (AZ Bar No. 020821)
pro hac vice
Bradley N. Boodt  (NV Bar No. 5228 )
3773 Howard Hughes Pkwy., Suite 500 North
Las Vegas, Nevada 89109
Telephone: (702) 792-3773
Fax:  (702) 792-9002
Email: atenciok@gtlaw.com
Email: boodtb@gtlaw.com

Attorneys for Petitioning Creditor Nevada State
Bank

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re:

**JOSEPH D. MILANOWSKI,**

Debtor.

Case No. BK-S-07-13162 LBR

(Chapter 11)

**PETITIONERS' TRIAL BRIEF**

Trial:      August 9, 2007
Time:     9:30 a.m.

{00412799;}

223740.7


# TABLE OF CONTENTS

**Page**

FACTS AND RESPONSES TO MILANOWSKI .................................................................. 1

    I.     USACM Trust Claims and Responses ................................................................. 1

          A.    The USACM Trust's Claims as Servicing Agent for Direct Lenders 1

          B.    Milanowski Receivable. ............................................................................. 5

          C.    USACM Trust's Responses to Milanowski's Defenses ...................... 5

    II.    DTDF Claims and Responses to Asserted Defenses ...................................... 8

          A.    DTDF's Claims ............................................................................................. 8

          B.    Responses to Milanowski's defenses ................................................. 11

    III.   NEVADA State Bank's Claims and Responses ............................................. 15

          A.    The Bank's Claims ..................................................................................... 15

          B.    The Bank's Responses to Milanowski's Defenses .......................... 16

    IV.   HESPERIA'S Claims and Responses ............................................................... 20

          A.    Hesperia's Claims ...................................................................................... 20

          B.    Hesperia's Responses to Milanowski's Defenses .............................. 22

    V.    Compass' Claims and Responses ..................................................................... 23

          A.    Compass' Claims ....................................................................................... 23

          B.    Compass' Responses to Milanowski's Defenses ............................... 29

               1.    Compass is a Qualified Petitioning Creditor ........................... 29

               2.    The Fact that the Notes Which Are the Subject of the Guaranties Are Secured or Guaranteed By Others Is Not Relevant ...................................................................................... 32

{00412799;}

223740.7

3. The Actions of the Nevada Mortgage Lending Division With Respect to Compass Has No Impact on the Rights of Compass to Pursue the Guaranties ........................................ 33

4. Compass Does Not Need a Further Power of Attorney to File the Involuntary Petition and Had Authority to So File Under the Applicable Loan Servicing Agreements ............................................................................... 35

5. There Is Sufficient Information to Determine How Compass Calculated Its Claim .................................................. 37

VI. Other Elements of Section 303 ........................................................ 37

A. Number of Eligible Milanowski Creditors ................................. 37

B. Milanowski Is Generally Not Paying His Debts As They Come Due ...................................................................................... 38

ARGUMENT ............................................................................................................ 38

I. The Burden of Proof and Effect of Milanowski's Exercise of Fifth Amendment Rights .......................................................................... 38

A. Petitioners Have The Initial Burden of Proof on Their Claims and the Elements of § 303. Milanowski Has the Burden Of Proof as to the Number of Eligible Debts, his Affirmative Defenses, Including Bona Fide Disputed Claims .............................. 38

B. The Court May Make Adverse Inferences from Milanowski's Assertions of Fifth Amendment Rights. ....................................... 39

II. The Petitioners' Claims Are Not Conditional as to Liability or the Subject of a Bona Fide Dispute as to Liability or Amount. ...................... 40

A. Under Nevada Law, Unconditional Guaranty Terms Are Enforceable, and Parol Evidence Is Not Admissible to Attempt to Show That Guaranties Are Conditional. ....................... 41

B. Milanowski's Waiver of Conditions to Enforceability of the Nevada Guaranties is Legally Effective in Nevada ................... 42

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

**Page**

C.    Milanowski's Waiver of Conditions to Enforceability in the
10-90 Guaranty Is Effective Under California Law........................... 43

D.    There Is No Bona Fide Dispute Over Any Of Petitioners'
Claims .................................................................................................. 44

III.    If Only One Of The Petitioners' Claims Is Eligible, Then Milanowski
Has Less Than 12 Eligible Creditors. If All Are Eligible, Then
There Are More Than Enough Petitioning Creditors. ................................ 45

A.    Milanowski Has Offered No Proof That He Has Any
Eligible Claims ..................................................................................... 45

B.    One Eligible Claim Is Enough, But If All Are Eligible,
They Are Enough .................................................................................. 46

IV.    Milanowski Is Generally Not Paying His Debts As They Become
Due. .................................................................................................................. 46

A.    The Ninth Circuit Standard ................................................................. 46

B.    Milanowski Has Offered no Proof that He Is Paying any of
His Debts as They Come Due ............................................................... 47

CONCLUSION................................................................................................................ 47



1

# TABLE OF AUTHORITIES

2

**Case**

3

**Page**

**Federal Cases**

4
*In re BDC 56, LLC,*
    330 F.3d 111 (2d Cir. 2003)........................................................38

5
*Bartmann v. Maverick Tube Corp.,*
    853 F.2d 1540 (10th Cir. 1988) ..................................................39

6

7
*Baxter v. Palmigiano,*
    425 U.S. 308 (1976)....................................................................39

8
*In re Byrd,*
    357 F.3d 433 (4th Cir. 2004) ......................................................38

9

10
*In re Crown Sportswear, Inc.,*
    575 F.2d 991 (1st Cir. 1978).......................................................39

11
*In re DemirCo Holdings, Inc.,*
    2006 WL 1663237 ......................................................................45

12

13
*In re Dilley,*
    339 B.R. 1 (1st Cir. BAP 2006) ..................................................39

14
*In re Focus Media, Inc.*
    378 F.3d 916 (9th Cir. 2004)..............................................46, 47

15

16
*Mandalay Resort Group v. Richard Bradley Miller,*
    292 B.R. 409 (9th Cir. 2003) ......................................................40

17
*In re Mason,*
    709 F.2d 1313 (9th Cir. 1983) ....................................................45

18

19
*In re Rimell,*
    946 F.2d 1363 (8th Cir. 1991) ....................................................38

20
*In re Rubin,*
    769 F.2d 611 (9th Cir. 1985) ...............................................38, 46

21

22
*Scudder v. Union Nat'l Bank,*
    91 U.S. 406 (1875)......................................................................40

23
*Securities and Exchange Commission v. Colello,*
    139 F.3d 674 (9th Cir. 1998) ......................................................39

24

25
*In re Seko Investment, Inc.,*
    156 F.3d 1005 (9th Cir. 1998) ....................................................20

26
*In re Sims,*
    994 F.2d 210 (5th Cir. 1993) ......................................................38

27

28

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

**Case**                                                                      **Page**

United States v. Solano-Godines,
  120 F.3d 957 (9th Cir. 1997) ................................................................ 39
Van Dyke v. Parker,
  83 F.2d 35 (9th Cir. 1936) .................................................................... 40
In re Vortex Fishing Sys., Inc.,
  277 F.3d 1057 (9th Cir. 2001) ........................................... 20, 38, 44, 46

**State Cases**

Brown v. Jensen,
  41 Cal. 2d 193 (1953) ......................................................................... 33
Brunzell v. Golden Gate National Bank,
  85 Nev. 345, 455 P.2d 31 (1969) ............................................ 18, 19, 42
Cathay Bank v. Lee,
  14 Cal. App. 4th (Cal. Ct. App. 1993), a ............................................. 43
Daly v. Del E. Webb Corp.,
  609 P.2d 319 (Nev. 1980) .................................................................... 41
Gage v. Phillips,
  21 Nev. 150, 26 P. 60 (1891) ......................................................... 39, 41
Kaldi v. Farmer's Insurance,
  117 Nev. 273, 21 P. 3d 16 (2001) ....................................................... 41
Lowden Inv. Co. v. General Electric Credit Co.,
  103 Nev. 374, 741 P.2d 806 (1987) ..................................................... 41
R-Ranch Markets #2, Inc. v. Old Stone Bank,
  16 Cal. App. 4th 1323 (1993) ............................................................. 32
Reno Club, Inc. v. Young Inv. Co.,
  64 Nev. 312, 182 P.2d 1011 (1947) ..................................................... 36
Ringle v. Bruton,
  120 Nev. 82, 86 P. 3d 1032 (2004) ..................................................... 41
Royal Indemnity Co. v. Special Services Supply Co.,
  82 Nev. 148, 413 P.2d 500 (1966) ....................................................... 41
Southern Trust Mortgage Co. v. K&B Door Co., Inc.,
  104 Nev. 564, 763 P.2d 353 (1988) ..................................................... 41
Union Bank v. Gradsky,
  265 Cal. App. 2d 40, 71 Cal. Rptr. 64 (1968) ..................................... 43
Vosburg Equipment v. Zupancic,
  103 Nev. 266, 737 P.2d 522 (1987) ..................................................... 36

LEWIS
AND
ROCA
—LLP—
LAWYERS

1                                                                    **Page**

2                        **Rules, Regulations and Statutes**

3      California Civil Code:

4          § 2787 ................................................................................................ 44

5          § 2806 ................................................................................................ 44

6          § 2845 ................................................................................................ 44

7          §2856 ................................................................................................. 43

8      United States Code:

9          11 U.S.C. § 303(b)(1) ....................................................................... 45

10         11 U.S.C. § 303(b)(2) ....................................................................... 45

11                              **Other Authorities**

12     2 Bernhardt, Roger, CEB CALIFORNIA MORTGAGE AND DEED OF TRUST
       PRACTICE § 9.41 (3d ed. 2007 update) ...................................................... 32
13
       NORTON BANKRUPTCY LAW AND PRACTICE 2D § 21.3 at 21-9 ......................... 44
14

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1      The USACM Liquidating Trust (the "USACM Trust"), USA Capital Diversified

2  Trust Deed Fund, LLC ("DTDF"), Nevada State Bank ("the Bank"), NV Hesperia

3  Investors, LLC ("Hesperia"), and Compass USA SPE LLC and Compass Financial

4  Partners LLC ("Compass") (collectively the USACM Trust, DTDF, the Bank, Hesperia

5  and Compass are "Petitioners") submit their Trial Brief as directed by the Court on July

6  27, 2007.

## FACTS AND RESPONSES TO MILANOWSKI CONTENTIONS ON FACTUAL ISSUES

9  **I.    USACM Trust Claims and Responses**

10      **A.    The USACM Trust's Claims as Servicing Agent for Direct Lenders**

11      The USACM Trust is the servicer with respect to three loans, as successor to

12  USACM and as described below.  (Berman Decl. ¶ 4).

13      Geoffrey L. Berman, Trustee of the USACM Trust, personally met with Scott Bice

14  of the Mortgage Lending Division of the State of Nevada ("MLD") as well as MLD

15  counsel.  With MLD consent, USA Commercial Mortgage Company ("USACM") and the

16  USACM Trust sought and this Court entered the Order Granting Second Joint Motion For

17  Order For Implementation Of Confirmed Plan on March 5, 2007 (the "Second Order").

18  That order provides in paragraph 5 that the USACM Trust is authorized to service the

19  specific loans for which that responsibility was subsequently transferred under the Plan,

20  without otherwise complying with MLD or Escrow Licensing requirements of the State of

21  Nevada.  The USACM Trust nevertheless provides Mr. Bice with informal reporting on

22  the status of loan collections as a courtesy on the following loans (Berman Decl. ¶ 10):

23      **Placer Vineyards 1 Loan**

24      The Placer Vineyards first loan ("Placer 1") is owed by Placer County Land

25  Speculators, LLC ("Placer") to about 343 investors.  Placer 1 was originated on

26  December 10, 2004 and matured on June 20, 2006.  The loan is evidenced by a Promissory

27  Note Secured by a Deed of Trust dated December 10, 2004, with an original principal

28  {00412799;}

223740.7

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   amount of $27,500,000, which could be increased by future advances to $31,500,000, as
2   thereafter modified. (Berman Decl. ¶ 10, Exs. 1-9 [Pet. Exs. 1-9]).

3       Interest accrues at the non-default rate of 12.5%. Upon default, interest accrues at
4   the default rate of 20% per annum. In addition, there is a late charge of 5% of any sum
5   that is past due under the Note. The loan has been in default for some time due to failure
6   to make payments and maturity of the loan without repayment. (Berman Decl. ¶ 12).

7       The USACM Trust has made demand upon Placer for repayment of the Placer 1
8   Loan. No payment has been received. (Berman Decl. ¶ 15, Ex. 19 [Pet. Ex. 19])

9   **Placer Vineyards 2 Loan**

10      The Placer Vineyards second loan ("Placer 2") is owed by Placer to about 118
11  investors. Placer 2 was originated on December 10, 2004, and matured on June 20, 2006.
12  This loan is evidenced by a Promissory Note Secured by a Deed of Trust dated December
13  10, 2004, with an original principal amount of $6,500,000. (Berman Decl. ¶ 13, Exs. 10-11
14  [Pet. Exs. 10-11]).

15      Interest accrues at the non-default rate of 16%. Upon default, interest accrues at the
16  default rate of 20% per annum. In addition, there is a late charge of 5% of any sum that is
17  past due under the note. The loan has been in default for some time due to failure to make
18  payments and maturity of the loan without repayment. (Berman Decl. ¶ 14).

19      The USACM Trust has made demand upon Placer for repayment of the Placer 2
20  Loan. No payment has been received. Berman Decl. ¶ 15, Ex. 19 [Pet. Ex. 19]).

21      According to the business records of the USACM Trust, the outstanding balance of
22  Placer 1 and 2 Loans are as follows (assuming no payments are received before the end of
23  the current month) (Berman Decl. ¶ 16):

|  | Placer Vineyards 1st | Placer Vineyards 2nd |
|---|---|---|
| **As of 7/31/2007** | | |
| Principal | $31,500,000.00 | $6,500,000.00 |
| Regular Interest | $7,616,342.82 | $1,990,158.68 |
| Default Interest | $4,590,002.88 | $499,767.00 |

{00412799;}                     2                     223740.7

| | | |
|---|---|---|
| Late Fees | $281,656.01 | $76,260.86 |
| Other Fees | | |
| **Total** | **$43,988,001.71** | **$9,066,186.54** |

The USACM Trust holds an Unconditional Guaranty executed by Thomas A. Hantges ("Hantges") and Joseph D. Milanowski ("Milanowski") of the obligations of Placer on Placer 1, which was acknowledged on December 14, 2004. (Berman Decl. ¶ 17, Ex. 8 [Pet. Ex. 8]).

The USACM Trust holds an Unconditional Guaranty executed by Hantges and Milanowski of the obligations of Placer on Placer 2, which was acknowledged on December 14, 2004. (Berman Decl. ¶ 18, Ex. 10 [Pet. Ex. 10]).

The USACM Trust has made demand upon the guarantors, including Milanowski, for repayment of the Placer 1 and 2 Loans and has not received any payment. (Berman Decl. ¶ 19).

**USA Investors VI, LLC aka Hotel Marquis (or Hotel Zoso) Loan**

USA Investors VI, LLC, a Nevada limited liability company ("Investors VI"), is obligated to certain direct Lenders represented by the USACM Trust as servicer pursuant to, among other things:

o    Construction Loan Agreement dated as of March 29, 2004

o    Promissory Note Secured by Deed of Trust dated March 29, 2004, in the original principal amount of $10,466,000. (Berman Decl. ¶ 20, Exs. 11-12 [Pet. Exs. 11-12]).

Pursuant to a Loan Extension Agreement dated as of February 5, 2006, the maturity date of the loan was extended to March 29, 2006. The loan has been in default for some time due to failure to make payments and maturity of the loan without repayment. (Berman Decl. ¶ 22, Ex. 13 [Pet. Ex. 13]).

1  Interest accrues at the non-default rate of 13%. Upon default, interest accrues at the

2  default rate of 20% per annum. In addition, there is a late charge of 5% of any sum that is

3  past due under the note. (Berman Decl. ¶ 21).

4  The USACM Trust has made demand upon Investors VI for repayment of the loan.

5  No payment has been received. (Berman Decl. ¶ 23).

6  According to the business records of the USACM Trust, the outstanding balance of

7  the Hotel Marquis Loan is as follows as of July 31, 2007 (again assuming no payments are

8  made before the end of the month) (Berman Decl. ¶ 24):

**Marquis Hotel**
**As of 7/31/2007**

| | |
|---|---|
| Principal | $13,500,000.00 |
| Regular Interest | $5,854,196.19 |
| Default Interest | $3,970,240.97 |
| Late Fees | $464,164.48 |
| Other Fees | |
| **Total** | **$23,788,601.64** |

15  Investors VI is a debtor in a chapter 11 business bankruptcy case pending in the

16  United States Bankruptcy Court for the District of Nevada, Case No. 07-12377,

17  consolidated with a prior involuntary case no. 06-13925. (Berman Decl. ¶ 25).

18  On July 16, 2007, Investors VI filed Debtor's Motion For Order (i) Approving

19  Sales Protections To APHM Zoso, LLC, a Delaware Limited Liability Company, As

20  Provided For In Agreement For Purchase And Sale Of Real Estate (And Joint Escrow

21  Instructions); (ii) Approving Procedures For Soliciting Higher And Better Offers, And

22  Determining Highest And Best Offer; (iii) Setting Hearing To Select Highest And Best

23  Offer, And To Approve Sale Of Assets And The Assumption And Assignment Of Leases

24  And Executory Contracts; And (iv) Granting Other Relief And Preliminary Report Of

25  Marketing ("Sales Procedures Motion"). The Sales Procedures Motion and exhibits

26  thereto represent that the purchaser will acquire the collateral for the Investors VI Loan for

27  $25,117,500 in cash plus other consideration. It would appear that there is sufficient

28

Case 06-10725-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 12 of 56

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1   consideration in this offer, if approved by the Court and if the transaction closes on the

2   terms stated, to pay the Investors VI Loan in full. However, bankruptcy counsel for

3   Investors VI has suggested that Investors VI may have no obligation to pay Default

4   Interest to the USACM Trust under certain circumstances, which assertion the USACM

5   Trust disputes. (Berman Decl. ¶ 26).

6        The USACM Trust holds an Unconditional Repayment and Completion Guaranty

7   executed by USA Investment Partners, LLC ("USAIP"), Hantges and Milanowski of the

8   obligations of Investors VI, which was acknowledged on March 26, 2004. (Berman Decl.

9   ¶ 27, Ex. 14 [Pet. Ex. 14]).

10       The USACM Trust has made demand upon the guarantors, including Milanowski,

11   for repayment of the Investors VI aka Hotel Marquis (now Hotel Zoso) Loan and has not

12   received payment. (Berman Decl. ¶ 28).

13       **B.**    **Milanowski Receivable.**

14       Mesirow Financial Interim Management investigated the books and records of

15   USACM and caused schedules of assets to be filed. USACM's schedules filed June 23,

16   2006 [Docket No. 784] reflect that Milanowski owed USACM $7,097.50 as a shareholder

17   account receivable. No payment has been received to date. (Berman Decl. ¶ 29).

18       The USACM Trust owns each of the claims described in this pretrial order pursuant

19   to the terms of the confirmed Plan, made demand on Hantges and Milanowski for

20   repayment; and has not received any payment or response. (Berman Decl. ¶ 30).

21       **C.**    **USACM Trust's Responses to Milanowski's Defenses**

22       Milanowski argues that the USACM Trust may not legally service the Placer or

23   Investors VI Loans. As to those loans, the USACM Trust is the successor to USACM

24   with respect to the servicer's rights under the Loan Servicing Agreements ("LSAs")

25   originally between USACM and the Direct Lenders by virtue of Plan confirmation. [Pet.

26   Exs. 22-28]

27

28

Milanowski asserts that USACM's right to service loans was terminated by the MLD. The USACM Trust, not USACM, services the loans at issue here. The USACM Trust is exempt from Nevada regulation under the Second Order described above. USACM's licensing is a red herring.

Milanowski asserts that the USACM Trust may not collect any debts from Milanowski because there was a forbearance agreement which the USACM Trust breached. The USACM Trust is not aware of any such agreement. USACM was never a party to a forbearance agreement, nor were the Direct Lenders under the Placer 1 or 2 or Investors VI Loans. USAIP, through Milanowski, made a note and security agreement with USACM for the benefit of all the jointly administered Debtors. The security agreement does not secure the obligations of Placer or Investors VI to the Direct Lenders. The security agreement and note are not a forbearance agreement, and Milanowski was not granted any period of forbearance. The USACM Trust is not asserting any claims against Milanowski under that note. [Pet. Exs. 20-21].

Milanowski asserts that he is not liable for the Placer and Investors VI Loans due to the value of the collateral for those Loans. Milanowski waived any such defense. For example, the Investors VI Unconditional Repayment and Completion Guaranty ("Marquis Guaranty") provides:

> This Guaranty is unconditional, absolute and continuing, and if for any reason any such sum shall not be paid promptly when due, ***Guarantor will immediately pay*** the same to the person entitled thereto pursuant to the provisions of the Note and Deed of Trust, respectively, as may be applicable, including principal and interest, as if such sums constituted the direct and primary obligation of Guarantor, regardless of any defenses or rights of set off or counterclaim which Borrower may have or assert, and ***regardless of whether any person shall have taken any steps to enforce any rights against Borrower or the property covered by the Deed of Trust*** or any other person to collect such sum, and ***regardless of any other condition or contingency.***[1] (emphasis added)

Milanowski is essentially arguing that he only guaranteed payment of the indebtedness after recourse to the collateral. The Marquis Guaranty provides otherwise:

---

[1] Unconditional Repayment And Completion Guaranty ("Marquis Guaranty"), Section 1(a) at page 1. Berman Decl. Ex. 18 [Pet. Ex. 18].

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

Case 06-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 14 of 56

(d) **The obligations**, covenants, agreement and duties **of Guarantor under this Guaranty shall in no way be affected or impaired by reason of** the happening from time to time of any of the following with respect to the Note or Deed of Trust or this Guaranty (all being collectively referred to herein as the "Instruments"), although without notice to or the further consent of Guarantor thereto:

\*\*\*

(v) the release of any security under the Deed of Trust or the release, modification, waiver or **failure to enforce any other guaranty, pledge[,] indemnity or security device whatsoever;**[2]

(h) The **liability of Guarantor under this Guaranty** is a guarantee of payment and performance and not of collectibility, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Loan Documents or other instruments relating to the creation or performance of the obligations guaranteed hereby or the **pursuit by Lender of any remedies which it now has or may hereafter have with respect thereto under the Loan Documents, at law, in equity or otherwise.** Guarantor hereby agrees that Guarantor's liability may be larger in amount and more burdensome than that of the Borrower. Guarantor's liability hereunder shall not be limited or affected in any way by any impairment or any diminution or loss of value of any security or collateral for the Loan, whether caused by hazardous substances, impaired soil characteristics or otherwise, Lender's failure to perfect a security interest in such security or collateral or any disability or other defense of Borrower or any other guarantor.[3] (emphasis added)

Further, action against the Borrower or the collateral is not required for liability under the Marquis Guaranty:

**The Guarantor irrevocably and unconditionally: ... (iii) Waives any and all legal requirements that the Lender**, its successors or assigns, **institute any action or proceedings at law or in equity against the Borrower** or anyone else **with respect to the Note, the Letter Agreement, the Deed of Trust or this Guaranty or with respect to any other security held by the Lender**, as a condition precedent to bringing any action against the Guarantor upon this Guaranty.[4] (emphasis added)

Similarly, the Unconditional Guaranty for Placer 2 ("Placer 2 Guaranty") provides a number of waivers, including:

**Guarantor hereby waives: (a) any right to require Lender to proceed against Borrower or any other guarantors of the Obligations;** (b) **any right to require Lender to proceed against or exhaust any security for the Obligations**; (c) any right to raise the defense of the Statute of Limitations ... ; (f) any right to raise any defense based upon an election of remedies by

---

[2] Marquis Guaranty Section 1(d)(v). *Id.*

[3] Marquis Guaranty Section 1(h) at page 3. *Id.*

[4] Marquis Guaranty Section 4(e)(iii). *Id.*

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

Lender, including without limitation, an election to proceed by non-judicial foreclosure, which destroys or otherwise impairs the subrogation of Guarantor or the right of Guarantor to proceed against Borrower for reimbursement, or both; ... (h) the benefits of the provisions of Nevada Revised Statutes Sections 40.430, 100.040 and 100.050 as such Section may be amended from time to time, which set forth certain rights and obligations among guarantors, debtors, creditors and persons primarily and secondarily liable on contracts, to the extent applicable, ....[5] (emphasis added)

Among the other waivers, Milanowski agreed that "Lender's right to payment under this Guaranty shall be enforceable against Guarantor regardless of whether a trustee's sale is held .... "[6] Similarly, the Guaranty is "continuing, absolute, irrevocable and unconditional guaranty of payment and performance of the Obligations and shall remain in full force and effect until the Obligations have been paid in full, ...."[7] Lender may release, surrender, or substitute all or part of the security without affecting the Guarantor's liability.[8] The unconditional nature of the Guaranty was reinforced in Section 7:

> This Guaranty is a guaranty of payment and performance, not collection, and Lender, without notice or demand, *may resort to and initiate legal action against Guarantor for payment of any of the Obligations* or performance of any covenant or agreement contained in t he Security Documents *whether or not Lender shall have resorted to any property or instruments securing any of the Obligations or shall have sought a deficiency judgment against the Borrower or shall have proceeded against any other guarantor* or any other obligor primarily or secondarily obligated with respect to any of the Obligations or such performance."[9] (emphasis added)

## II.    DTDF Claims and Responses to Asserted Defenses

### A.    DTDF's Claims

DTDF owns 100% of the 10-90 Loan, which is a non-performing loan with a principal balance of $55,113,781 and accrued interest of tens of millions of dollars.

The primary loan transaction documents for the 10-90 Loan are as follows:

---

[5] Unconditional Guaranty ("Placer 2 Guaranty") § 2 at pages 1-2. Berman Decl. Ex. 11 [Pet. Ex. 11]

[6] Placer 2 Guaranty § 3 at page 2. *Id.*

[7] Placer 2 Guaranty § 5 at page 3. *Id.*

[8] Placer 2 Guaranty § 6 at page 3. *Id.*

[9] Placer 2 Guaranty § 7 at page 2. *Id.*

{00412799;}                                   8                                   223740.7

*LEWIS AND ROCA LLP LAWYERS*

1  ***The "USAIP Loan Documents"***

2     a.     Loan Agreement dated as of April 10, 2002, between USAIP, as borrower,

3  and 10-90, Inc., as lender;

4     b.     Promissory Note dated as of April 10, 2002, made by USAIP as borrower in

5  favor of 10-90, Inc. as lender (as amended by the USAIP First Amendment referred to

6  below, the "USAIP Note");

7     c.     Guaranty dated as of April 10, 2002, in favor of 10-90, Inc. as lender given

8  by Milanowski, as guarantor, and Hantges, as guarantor ("10-90 Guaranty");

9     d.     First Amendment to Loan Documents dated as of October 6, 2003, between

10  USAIP and 10-90, Inc. (the "USAIP First Amendment");

11     ***The 10-90, Inc. Loan Documents***

12     e.     Revolving Loan and Security Agreement dated as of April 12, 2002,

13  between 10-90, Inc., as borrower, and DTDF, as lender;

14     f.     Promissory Note Secured by Deed of Trust in the face amount of

15  $40,000,000 (later increased to $75,000,000) dated April 12, 2002, executed by 10-90, Inc.

16  in favor of DTDF;

17     g.     First Amendment to Loan Documents dated as of October 6, 2003, between

18  10-90, Inc. and DTDF;

19     ***The Collateral Assignment of the USAIP Loan Documents to DTDF***

20     h.     Collateral Assignment of Beneficial Interest dated as of April 12, 2002,

21  between 10-90, Inc. as assignor and DTDF as assignee whereby 10-90, Inc. as borrower

22  collaterally assigned to DTDF all of the rights of 10-90, Inc. as lender in the USAIP Loan

23  Documents;

24     ***The Collapse of the Two Transactions Into One Transaction***

25     i.     Agreement for Transfer of Promissory Note dated as of January 1, 2005,

26  between 10-90, Inc. as transferor and DTDF as transferee, and consented to by USAIP as

27  the obligor on the note to be transferred, and Milanowski as guarantor and Hantges as

28  {00412799;}                                 9                                 223740.7

1    guarantor, whereby 10-90, Inc. transferred to DTDF the USAIP Note and other USAIP
2    Loan Documents; and

3                            ***The Default Letter***

4            j.      Default Letter dated as of August 7, 2006, from USACM to USAIP,
5    Milanowski and Hantges formally notifying such parties of their defaults in connection
6    with the 10-90 Loan.

7            The 10-90 Loan is the largest loan in the entire USACM portfolio by far.
8    According to the documentation of the 10-90 Loan, the 10-90 Loan was originated in
9    April of 2002, and was secured by an assignment by the borrower, 10-90, Inc. of its
10   interest in a nearly contemporaneous loan made by 10-90, Inc. to USAIP. It appears that
11   10-90, Inc. was used as a straw man for USAIP since the books and records FTI has
12   reviewed evidence the fact that 10-90, Inc. received funds from DTDF and
13   contemporaneously transferred the funds to USAIP.

14          The 10-90, Inc. Loan was formally transferred from 10-90, Inc. to USAIP on
15   January 1, 2005, thereby eliminating the participation of 10-90, Inc. and with the result
16   that USAIP was thereafter the direct borrower of DTDF.

17          The 10-90 Loan is currently in default and is fully due and payable. No response
18   has been received to an August, 2006 default letter.

19          In all the documentation that FTI has reviewed bearing up9on the 10-90 Loan,
20   DTDF has discovered no documentation indicating that USAIP disputes its liability for the
21   10-90 Loan or that Milanowski or Hantges dispute their liability as guarantors on the loan,
22   nor any indication that the principal amount of the loan is subject to any dispute
23   whatsoever.

24          In all the documentation that FTI has reviewed bearing upon the 10-90 Loan,
25   DTDF has discovered no documentation indicating that USAIP disputes its liability for the
26   10-90 Loan or that Milanowski or Hantges dispute their liability as guarantors on the loan,

27
28   {00412799;}                                    10                                    223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1    nor any indication that the principal amount of the loan is subject to any dispute

2    whatsoever.

3    **B.    Responses to Milanowski's defenses**

4    ***Forbearance:*** Milanowski claims in the Pretrial Order that:

5    The terms of a $58,000,000 pledge agreement dated May 31, 2006
     between Milanowski, USACM and Diversified (the "Pledge Agreement")
6    allowed Milanowski and USA Investment Partners ("USAIP") one year
     within which to make a payment of $20,000,000 to USACM Trust and
7    Diversified. On the condition USAIP made the payment USACM and
     Diversified agreed to forebear collection on the pledge and the $55,000,000
8    10-90 loan from Diversified in exchange for the additional collateral
     pledged. USACM Trust and Diversified breached the Pledge Agreement by
9    filing this involuntary petition and the involuntary petition against USA
     Investment Partners, prior to the expiration of the one year time period. The
10   breach of the Pledge Agreement discharged Milanowski from his guaranty
     obligations under the Pledge Agreement, the $55,000,000 loan from
11   Diversified and the $7,000 loan from USACM Trust. Therefore, there is a
     bona fide dispute regarding claims asserted by USACM Trust and
12   Diversified.

13   As a cursory review of the Pledge Agreement will readily reveal, there are no terms

14   of forbearance whatsoever agreed to therein. The terms of the related promissory note in

15   the approximate amount of $58 million (the "$58mm Promissory Note"), attached to

16   Petitioners' Exhibit 20, as listed in the Pretrial Order, provide that all amounts owing

17   thereunder are due one year hence, that is, May 31, 2007. In the event that USAIP were

18   able to make payment of at least $20 million on the $58mm Promissory Note before

19   May 31, 2007, the maturity date would be extended by one year to May 31, 2008[10]. There

20   are no terms of forbearance in the $58mm Promissory Note.

21   Milanowski apparently interprets this performance benchmark in the $58mm

22   Promissory Note to constitute an affirmative agreement made by USACM and DTDF to

23   forbear from taking any action against either USAIP or Milanowski prior to May 31, 2007,

24   at the risk of exonerating both Milanowski and USAIP on this and other, unrelated

25   obligations. This, even though there is no language whatsoever supporting this

26

27   _____

28   [10] See, the second paragraph of the $58mm Promissory Note, attached to Pet. Ex. 20.

{00412799;}                                         11                                          223740.7

LEWIS
AND
ROCA
—LLP—
LAWYERS

Case 06-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 19 of 56

interpretation within the documents upon which Milanowski relies[11], even though DTDF was not even a party to the $58mm Promissory Note, and even though neither USACM nor DTDF was required to sign either the Security Agreement or the $58mm Promissory Note.

How any of this could affect the unrelated obligations of Milanowski, who is not a party to either the $58mm Promissory Note or the Security Agreement, and who is not even a guarantor of the $58mm Promissory Note[12], is a total mystery. Likewise, the remedy suggested by Milanowski for a breach of the non-existent forbearance obligation of exonerating USAIP and Milanowski, even on unrelated obligations, is apparently crafted from whole cloth.

***Marshalling of Assets:*** As an additional defense, Milanowski asserts in the Pretrial Order that:

> The claims are fully or partially secured and are guaranteed by certain third party guarantors. The creditors could resort to the collateral and the guaranties to satisfy the claims in full or significantly reduce the amount of the claims. Therefore, these claims are contingent claims under §303(b).

The 10-90 Loan is not guaranteed by anyone other than Hantges, himself a chapter 11 debtor. And the only collateral for the 10-90 Loan consists of speculative equity interests of unknown and unknowable value.[13] As a practical matter, this position is an exercise in circular logic in that Milanowski could assert that DTDF should proceed first against Hantges -- and Hantges would assert that DTDF should proceed first against Milanowski – with the result that DTDF could proceed against neither guarantor under the 10-90 Guaranty. This obviously makes no sense.

---

[11] To the contrary, there are multiple provisions of the Pledge Agreement that directly undercut Milanowski's assertions, including section 5, "Relation to Other Security Documents; Mortgage Loans", section 11.2 "Secured Party's Duties and Obligations", section 17, "No Waiver by Secured Party", section 19, "Marshalling".

[12] Contrary to the Milanowski statement in the Pretrial Order, he did not guarantee the $58mm Promissory Note.

[13] Notwithstanding the fact that the DTDF prospectus promised the DTDF investors that DTDF would only invest in loans secured by first deeds of trust on real property with conservative loan to value ratios to non-insider borrowers, the 10-90 Loan violated all of such assurances, and others.

1  Similarly, requiring DTDF to exhaust its remedies against the collateral for the 10-

2  90 Loan makes just as little sense, as the collateral consists of limited liability company

3  equity interests in several companies in the process of developing real estate projects.

4  Foreclosure upon a member interest in a limited liability company accomplishes little,[14]

5  and the long-term nature of the business of completing and marketing real estate

6  developments, especially in a troubled real estate market, ensures that it would be years

7  before DTDF would exhaust its right to receive distributions otherwise payable to USAIP

8  from the completion and sale of these real estate projects. So the practical effect of

9  Milanowski's argument in the case of the 10-90 Guaranty would be that DTDF would be

10  precluded for a number of years from taking action against Milanowski on the 10-90

11  Guaranty. This too makes no sense.

12  In addition to the marshalling argument advanced by Milanowski making no logical

13  sense, Milanowski expressly agreed to exactly the opposite by his execution of the 10-90

14  Guaranty. The 10-90 Guaranty addresses many of these issues in the passages set forth

15  below.

16  For example, paragraph 4 of the 10-90 Guaranty makes it clear that Milanowski

17  agreed that DTDF could sue on the 10-90 Guaranty prior to exercising (much less

18  exhausting) remedies against the collateral, USAIP, Hantges or any other entity.

19  **4.    Nature of Guarantor's Liability**. This Guaranty is
irrevocable. Guarantor's obligations and liabilities under this Guaranty are

20  independent of Borrower's obligations and liabilities under the Loan
Documents, and *a separate action or actions may be brought and*

21  *prosecuted against Guarantor whether action is brought against Borrower
or any other guarantor or Person, whether or not any foreclosure has been*

22  *or is going to be initiated with respect to any security of the Indebtedness,
or whether Borrower or any other guarantor or Person are joined in any*

23  *such action or actions.* Accordingly, Lender may proceed against all or less
than all parties liable for the Indebtedness and Lender need not proceed

24  against Borrower, Guarantor or any other party; and *Guarantor agrees that
any payment or performance required to be made by Guarantor hereunder*

25

---

26  [14] As the Court is no doubt aware, the operating agreement for almost all limited liability companies
provides that any unauthorized or involuntary transfer of a member interest results in the transferee

27  receiving only a bare economic interest without the right to participate in company affairs, without the
right to vote on company decisions, without the right to inspect the books or records of the company, and

28  without the right to bring suit as a member of the limited liability company.

{00412799;}                                          13                                          223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1

2

*shall become due on demand immediately upon the happening of an event of default* (as defined in the Loan Documents), or any other failure to pay or perform any one or more of the Indebtedness. * * * (emphasis added).

3

Paragraph 5 of the 10-90 Guaranty makes it clear that Milanowski agreed that he

4

could not raise any marshalling of assets arguments against DTDF.

5

        5.    **Guarantor's Authorization.** * * * Guarantor consents and agrees that *Lender shall be under no obligation to marshal any assets* in favor of Guarantor, or against or in payment of any or all of the Indebtedness. Lender shall not be required to mitigate damages or take any action to reduce, collect or enforce the Indebtedness. * * * (emphasis added).

6

7

8

In paragraph 6 of the 10-90 Guaranty, Milanowski specifically waived any defense

9

to payment on the 10-90 Guaranty even if 10-90, Inc. were no longer liable on the

10

underlying obligation, and further waived any right to compel DTDF to exhaust its

11

remedies against USAIP or the collateral.

12

        6.    <u>Waivers</u>.

13

        (a)    Guarantor waives any and all rights or defenses arising by reason of:

14

        * * *

15

        (ii)    any defense arising by reason of any disability or other defense of Borrower, Guarantor, or any other guarantor or any endorser, co-maker or other person, or by reason of the partial or complete cessation from any cause whatsoever of any liability of Borrower or any other guarantor or endorser, co-maker or other person, with respect to all or any part of the Indebtedness, or by reason of *any act or omission of Lender or others which directly or indirectly results in the discharge or release of Borrower,* either of the parties constituting Guarantor, or any other guarantor or any other person or any Indebtedness or any security therefor, whether by operation of law or otherwise;

16

17

18

19

20

        * * *

21

        (viii)  *any right to require Lender to institute suit against, or to exhaust its right and remedies against, Borrower, Guarantor, or any other person, or to proceed against any property of any kind which secures all or any part of the Indebtedness*, or to exercise any right of offset or other right with respect to any reserves, letters of credit or deposit accounts held by or maintained with Lender or any indebtedness of Lender to Borrower, or to exercise any other right or power, or pursue any other remedy Lender may have;

22

23

24

25

        * * *

26

        (xi)    *any defense based on invalidity or unenforceability of all or any part of the Indebtedness . . .*

27

        * * *

28

{00412799;}

14

223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1

2

3

4

      (c)    *Guarantor waives all rights to require Lender to (i) seek payment of the Indebtedness from Borrower, any other guarantor or Person, or from any collateral or other security securing the Indebtedness, before enforcing Guarantor's obligations under this Guaranty*, . . . or (v) *enforce any remedy which Lender now has or hereafter may have against Borrower, any other guarantor* or Person. (emphasis added).

5

In short, Milanowski contractually agreed that he would not and could not raise any

6

of the arguments he now raises with respect to the 10-90 Guaranty[15].

7

### III.   Nevada State Bank's Claims and Responses

8

#### A.   The Bank's Claims

9

Nevada State Bank (the "Bank") holds an unsecured claim against the Debtor

10

which exceeds $300,000, pursuant to the guaranty of the loan described herein. The Bank

11

has filed the Declaration of James Rimpo (the "Rimpo Decl."), and references herein are

12

to Exhibits to the Rimpo Declaration.

13

In April, 2000, the Bank extended an unsecured commercial line of credit in the

14

original maximum principal amount of $250,000 to USACM (the "NSB Loan"). The NSB

15

Loan is evidenced by a promissory note (the "NSB Note") dated April 17, 2000 (Ex. 1,

16

Rimpo Decl. [Pet. Ex. 43]), and was guaranteed by, inter alia, the Debtor herein (the "NSB

17

Guaranty") (Ex. 2, Rimpo Decl. [Pet. Ex. 44]). The making of the NSB Loan was

18

conditioned upon the execution of the NSB Guaranty.

19

The original maturity date of the NSB Loan was April 17, 2001 ("Original Maturity

20

Date"). Shortly before the Original Maturity Date, Milanowski requested that the Original

21

Maturity Date be extended. The Bank agreed to extend the Original Maturity Date to

22

April 17, 2002. The extension was documented through re-execution of the NSB Note and

23

NSB Guaranty as, shortly before the Original Maturity Date, the NSB Loan was

24

transferred from the Bank's retail lending department to its corporate lending department,

25

requiring re-execution of the loan documents, including all personal guaranties relating to

26

27

28

---

[15] As discussed in the Argument section of this brief, these guarantor waivers are given effect under California law, the law that Milanowski agreed would govern the 10-90 Guaranty.

{00412799;}

15

223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

Case 06-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 23 of 56

1  each loan (Re-executed NSB Note and NSB Guaranty attached at Ex. 3, Rimpo Decl. [Pet.

2  Ex. 45]).

3       Over the course of the next several years, the maturity date of the NSB Loan was

4  extended several times at the Debtor's request.  In 2004, the principal balance of the NSB

5  Loan was increased to $300,000.  The Bank has sent written demand for payment of the

6  NSB Loan to the Debtor and the other guarantors of the Loan, and has received no

7  payment to date.  The principal amount due and owing on the NSB Loan is $300,000,

8  interest accrued as of July 24, 2007 is $40,320.83.  The Bank has incurred, and continues

9  to incur, significant costs and fees associated with collecting on the NSB Loan, which

10  costs and fees are also recoverable under the NSB Note and NSB Guaranty.

11       **B.**   **The Bank's Responses to Milanowski's Defenses**

12       The Debtor claims that when the Bank extended the maturity date of the NSB Loan

13  in 2002 without requiring re-execution of the NSB Guaranty, his obligations under the

14  NSB Guaranty were terminated, and a bona fide dispute, therefore, exists as to the Bank's

15  claim.  This defense, however, does not identify an objective basis for either a factual or a

16  legal dispute as to the validity of the NSB Guaranty.

17       First, the plain language of the NSB Guaranty does not support Milanowski's

18  claim.  As evidenced by the first page of the NSB Guaranty, under the paragraph entitled

19  "Indebtedness", the NSB Guaranty provides that it includes all indebtedness of USACM to

20  the Bank, then existing or thereafter incurred.  (Ex. 2, Rimpo Decl. [Pet. Ex. 44]).  As

21  evidenced by the paragraph designated "DURATION OF GUARANTY", the NSB

22  Guaranty provides that (a) it continues in full force until all indebtedness of USACM to

23  Bank is fully paid, (b) it can be revoked only pursuant to a writing, sent to the Bank via

24  certified mail, which revocation is only effective as to advances made after receipt by the

25  Bank of the written revocation, and does not include indebtedness incurred prior to such

26  receipt, and (c) all renewals, extensions, substitutions and modification of the indebtedness

27

28  {00412799;}

223740.7

1  continue to be guaranteed by the NSB Guaranty, and are specifically not considered to be

2  new indebtedness. (Ex. 2, Rimpo Decl. [Pet. Ex. 44]).

3          In addition, James Rimpo, Senior Vice-President with the Bank ("Rimpo"), has

4  testified by declaration that the extensions of the maturity dates of the NSB Loan did not

5  constitute new loans, and that the Debtor never revoked his NSB Guaranty in writing, as

6  required (or orally for that matter), but to the contrary, took the following actions

7  indicating his understanding and agreement to the continued effectiveness of the NSB

8  Guaranty:

9          1)      On October 1, 2002, Rimpo sent a letter to Milanowski requesting copies of

10  his 2001 personal tax returns. (Rimpo Decl, ¶ 8, Ex. 6 [Pet. Ex. 48]). In response to the

11  letter, Milanowski sent Rimpo his 2001 personal tax returns.

12          2)      On May 15, 2003, in anticipation of the June 17, 2003 maturity date of the

13  NSB Loan and a subsequent renewal, Rimpo sent another letter to Milanowski requesting

14  copies of his 2002 personal tax returns. (Rimpo Decl., ¶ 9, Ex. 8 [Pet. Ex. 49]). A follow-

15  up letter was sent on December 1, 2003. (Rimpo Decl., ¶ 9, Ex. 8 [Pet. Ex. 50]). In

16  response to the letter, Milanowski sent Rimpo not only copies of his 2002 tax returns, but

17  also a Personal Financial Statement. Attached to Milanowski's Personal Financial

18  Statement is a Financial Statement Warranty, executed by Milanowski in his individual

19  capacity on July 30, 2003, which provides that the financials are being given to the Bank

20  to induce the Bank to permit Milanowski to continue to guarantee USACM's indebtedness

21  to the Bank on personal guaranties. (Rimpo Decl., ¶ 9, Ex. 10 [Pet. Ex. 51).

22          3)      On June 8, 2004, in anticipation of the June 17, 2004 maturity date of the

23  NSB Loan and a subsequent renewal, Rimpo sent a letter to Milanowski requesting copies

24  of his 2003 personal tax returns and current financial statements. (Rimpo Decl., ¶ 10,

25  Ex. 12 [Pet. Ex. 53]) In response to the letter, Milanowski sent Rimpo copies of his 2003

26  tax returns and Personal Financial Statement. Attached to Milanowski's Personal

27

28

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1    Financial Statement is a Financial Statement Warranty, executed by Milanowski in his

2    individual capacity on August 9, 2004. (Rimpo Decl., ¶10, Ex. 13 [Pet. Ex. 54]).

3         4)    On July 14, 2005, in anticipation of the August 3, 2005 maturity date of the

4    NSB Loan and a subsequent renewal (the final such renewal), Rimpo sent a letter to

5    Milanowski requesting copies of his 2004 personal tax returns. (Rimpo Decl., ¶ 11, Ex. 15

6    [Pet. Ex. 56]). In response to the letter, Milanowski sent Rimpo copies of his 2004 tax

7    returns and Personal Financial Statement Worksheets. Attached to Milanowski's Personal

8    Financial Statement is a Financial Statement Warranty, executed by Milanowski in his

9    individual capacity on March 1, 2005. (Rimpo Decl., ¶ 11, Ex. 16 [Pet. Ex. 57]).

10        5)    Finally, in conjunction with the extension of the August 3, 2005 maturity

11   date, Milanowski executed, on behalf of USACM, a Business Loan Agreement dated

12   August 3, 2005. (Rimpo Decl., ¶ 12, Ex. 17 [Pet. Ex. 58]). On page two of this Business

13   Loan Agreement, the Paragraph entitled "Guaranties" provides that Hantges, Milanowski

14   and the Trust are all guarantors of the NSB Loan.

15        In *Brunzell v. Golden Gate National Bank*, 85 Nev. 345, 455 P.2d 31 (1969), the

16   Nevada Supreme Court rejected the argument of a guarantor that his continuing guaranty

17   was no longer effective as he had submitted a written notice of revocation of the guaranty.

18   The underlying borrower had originally executed two notes in favor of the bank, each in

19   the amount of $20,000. Subsequent to execution of a continuing guaranty by Brunzell, the

20   bank cancelled the two notes in favor of one note in the amount of $40,000. The guarantor

21   claimed to have sent written revocation of his guaranty prior to execution of the $40,000

22   note. The court examined the revocation notice and determined that it was not sufficient

23   to tender notice of the guarantor's intent to no longer be obligated on the guaranty, and that

24   therefore, there was nothing which terminated the guarantor's status as a guarantor, or of

25   his continuing liability under the guaranty. *Id.*

26        As in *Brunzell*, the NSB Guaranty required submission of written revocation in

27   order for Milanowski to not be liable as to future indebtedness of USACM. As in

28   {00412799;}                                  18                                  223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1    Brunzell, Milanowski sent no such written revocation. In fact, Milanowski's claim to no

2    longer be obligated to the Bank on the NSB Guaranty is even less convincing than the

3    claim rejected by the court in *Brunzell*. At least in *Brunzell*, there was a written notice

4    submitted to the bank, which the court determined to be insufficient. In the present case,

5    there is no writing whatsoever that was submitted by Milanowski to the Bank. If the

6    Nevada Supreme Court rejected a writing as insufficient to revoke a guaranty, then

7    certainly no writing at all is insufficient. It is also worthy to note that in *Brunzell*, the

8    guaranty was upheld despite the re-documentation of the underlying note.

9        If Milanowski really believed that he was no longer obligated on the NSB

10    Guaranty, he would not have sent personal tax returns and financial statements to the

11    Bank. Nor would he have signed documentation after the supposed termination of the

12    NSB Guaranty in which he acknowledges his status as a guarantor, and acknowledges that

13    his personal financial information was being provided to the Bank in support of such

14    guaranties. In light of these actions and the plain language of the NSB Guaranty, the

15    Personal Financial Warranties and the Business Loan Agreement, Milanowski's claim to

16    no longer be obligated on the NSB Loan does not meet the standard identified by the Ninth

17    Circuit for determining the existence of a bona fide dispute, which is that there be an

18    objective basis for either a factual or a legal dispute as to the validity of the guaranty.

19        The plain language of the documents signed by Milanowski is directly contrary to

20    his argument. Milanowski's own actions in submitting personal financial statements to the

21    Bank upon each extension of the maturity date is contrary to his claim. His own actions in

22    executing, as recently as 2005, Financial Statement Warranties and a Business Loan

23    Agreement acknowledging the NSB Guaranty do not support Milanowski's claim. And

24    his failure to revoke the NSB Guaranty in writing is contrary to Milanowski's claim. Even

25    if such a revocation had been sent, it would not be effective as to amounts then

26    outstanding. There is no objective basis for a legal or factual dispute and therefore, no

27    bona fide dispute exists.

28    {00412799;}

19

223740.7

1    Milanowski also may claim that the denial, without prejudice, of a motion for
2    summary judgment filed by the Bank in a state court action on the NSB Guaranty
3    constitutes evidence of a bona fide dispute.  However, the motion was denied without
4    prejudice prior to any discovery being conducted in the case, and the court did not rule on
5    the merits of the Bank's claims.  Furthermore, under Ninth Circuit precedent,
6    Milanowski's mere act of opposing the state court action is insufficient to show the
7    existence of a bona fide dispute.  *See, e.g., In re Vortex Fishing Sys., Inc.*, 277 F.3d 1057,
8    1066 (9th Cir. 2001) (stating that the "mere existence" of pending litigation is insufficient
9    to establish the existence of a bona fide dispute); and *In re Seko Investment, Inc.*, 156 F.3d
10   1005, 1007 (9th Cir. 1998) (holding that "a counterclaim doesn't automatically render a
11   claim subject to dispute" under Section 303(b).

12   **IV.    Hesperia's Claims and Responses**

13   **A.    Hesperia's Claims**

14   NV Hesperia Investors, LLC ("Hesperia") purchased six promissory notes
15   (collectively, the "Vineyard Notes") from Vineyard Bank that were matured debts of
16   Southern California Land Development, LLC ("SoCal Borrower") and guaranteed by
17   Milanowski, the Joseph D. Milanowski Trust and Hantges.

18   (a)    USAIP is the maker of a Promissory Note dated September 27, 2004, in the
19   original principal amount of $560,000.00, payable to the order of Vineyard Bank.
20   Borrower assumed the obligation by an Assumption Agreement dated December 27, 2005.

21   (b)    USAIP is the maker of a Promissory Note dated September 27, 2004, in the
22   original principal amount of $800,000.00, payable to the order of Vineyard Bank.  SoCal
23   Borrower assumed the obligation by an Assumption Agreement dated December 27, 2005.

24   (c)    USAIP is the maker of a Promissory Note dated September 27, 2004, in the
25   original principal amount of $685,000.00, payable to the order of Vineyard Bank.  SoCal
26   Borrower assumed the obligation by an Assumption Agreement dated December 27, 2005.

27

28

{00412799;}

223740.7

(d)     SoCal Borrower is the maker of a Promissory Note dated March 8, 2005, in the original principal amount of $250,000.00, payable to the order of Vineyard Bank.

(e)     SoCal Borrower is the maker of a Promissory Note dated March 8, 2005, in the original principal amount of $239,500.00, payable to the order of Vineyard Bank.

(f)     SoCal Borrower is the maker of a Promissory Note dated March 8, 2005, in the original principal amount of $212,500.00, payable to the order of Vineyard Bank.

Milanowski absolutely and unconditionally guaranteed the obligations of SoCal Borrower to Vineyard Bank pursuant to a Commercial Guaranty dated March 8, 2005, and he absolutely and unconditionally guaranteed the obligations of Borrower to Vineyard Bank pursuant to a Commercial Guaranty dated December 27, 2005. The Joseph D. Milanowski 1998 Trust absolutely and unconditionally guaranteed the obligations of Borrower to Vineyard Bank pursuant to a Commercial Guaranty dated March 8, 2006 (collectively, "Vineyard Guaranties").

The unpaid balance of the Vineyard Notes, including accrued and unpaid default interest, unpaid late fees and costs totals $3,419,727.02 as of June 10, 2007.

Vineyard Bank assigned the Vineyard Loans to Hesperia on March 30, 2007. Hesperia acquired all of Vineyard Bank's rights against Milanowski and his trust, including under the Vineyard Guaranties, for good and valuable consideration. Hesperia purchased all of Vineyard Bank's right, title and interest in the Notes as an investment and not for the purpose of commencing the above-captioned involuntary case.

Prior to assigning its interests in the Vineyard Notes to Hesperia, Vineyard Bank made written demand on the SoCal Borrower for payment on the Vineyard Notes in or around September 2006. Shortly after Hesperia purchased Vineyard Bank's right, title and interest in the Vineyard Notes, in or around late March or early April 2007, Hesperia made oral demands on the SoCal Borrower for payment on the Vineyard Notes.

{00412799;}                                    21

Hesperia is unaware of any condition to Milanowski's obligations to Hesperia. Hesperia has not waived or modified any of Milanowski's obligations as described in this Declaration.

**B.    Hesperia's Responses to Milanowski's Defenses**

In the Amended Answer, Milanowski asserts that Hesperia's claims are not non-contingent claims that are secured by real property and guaranteed by certain third parties. Amended Answer, ¶ 7.  Milanowski's defenses are without merit.  Hesperia's claims are similar to those of Compass, and Hesperia is a qualified petitioning creditor for the same general reasons as iterated below in Sections V.B.1 and V.B.2, *infra*.

Each of the claims Hesperia has against Milanowski under the Vineyard Guaranties given by Milanowski and the Milanowski 1998 Trust is non-contingent.  The Vineyard Guaranties are attached to the Fetterly Declaration as Exhibits 7 through 9 [Pet. Ex. 55 through 57].  As with the Compass Guaranties, all of the Vineyard Guaranties are similar. Each has all of the traditional suretyship waiver provisions, and each is a guaranty of payment and not of collection.  Exhibit 7 to the Fetterly Declaration [Pet. Ex. 55] is typical of the Vineyard Guaranties.  Specifically, it provides that the Vineyard Guaranty is a guaranty of payment and performance, not collection, and that Lender may resort to action against the guarantor without notice or demand to the guarantor.  [*Id.* at § 2 ("Continuing Unlimited Guaranty"), § 8, ¶ 1(A) ("Guarantor's Waivers")].  The guarantor waives any right to require the lender to proceed against any person, including the borrower, [*id.* at § 8, ¶ 1(B)] before proceeding against the guarantor, against any collateral [*id.* at ¶ 1(C)], and any right to raise any defenses because the borrower's obligation is secured by real property. *Id.* at ¶ 3.

Whether Hesperia's claims are secured by real property or guaranteed by third parties is irrelevant.  Each of the Vineyard Guaranties contains a complete waiver of any obligation of Hesperia to resort to the collateral or first proceed against any person before proceeding against Milanowski and further provides that a direct action may be brought

1   against the Milanowski without demand or notice.  Hesperia holds, by virtue of the

2   Vineyard Guaranties, six separate non-contingent claims against Milanowski, each

3   exceeding $12,300, and the power to pursue all matters relating to the Vineyard

4   Guaranties.  Thus, as a qualified petitioning creditor, Hesperia's joinder in the filing of the

5   involuntary petition was appropriate, and the Court should enter an order for relief.

6   **V.    Compass' Claims and Responses**

7         **A.    Compass' Claims**

8         On February 16, 2007 (the "Compass Closing Date"), Compass acquired certain of

9   the assets of USACM, USA Capital First Trust Deed Fund, and their other affiliated

10   debtors (collectively such debtors are referred to as the "USA Debtors", and their

11   bankruptcy cases as the "USA Bankruptcy Cases") (collectively, the "Compass Assets") in

12   exchange for substantial cash consideration.  The terms of Compass' acquisition of the

13   Compass Assets were set forth in an Asset Purchase Agreement, dated December 8, 2006

14   (the "APA"), which was approved by the Bankruptcy Court pursuant to that certain Order

15   Confirming the Debtors' Third Amended Joint Chapter 11 Plan of Reorganization entered

16   in the USA Bankruptcy Cases on January 8, 2007 (the "Confirmation Order").

17   Subsequent to the Compass Closing Date, Compass has worked in its capacity as loan

18   servicer to the loans which were the subject of the APA.

19         Compass owns the loan servicing rights for the following six loans, which are

20   collectively called the "Compass Loans." Each of the Compass Loans was a loan that was

21   subject to the APA in the USA Bankruptcy Cases.  Each of the Compass Loans is

22   evidenced by the promissory notes, all of which are or were secured by real estate and in

23   some cases other property, located either in California, Arizona, or Nevada, and such notes

24   are hereinafter called the "Compass Notes."  There is a maturity default under each of the

25   Compass Notes other than the Copper Sage Note, and all amounts are presently due and

26   owing under all of the Compass Notes other than the Copper Sage Note. Following is a

27   listing of each of the Compass Notes, and the amounts due under each of the Compass

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

Case 18-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 31 of 56

Notes as of June 1, 2007. Under each of the Compass Loans, and in addition to its rights as owner of the loan servicing, Compass holds a fractional interest in the amounts listed below. Each of the Compass Notes was in the files and records transferred to Compass at the time of the Compass Closing of the purchase by Compass of the Compass Assets. Compass holds the original of each of the Compass Notes, which are described in further detail as follows:

**Bundy Canyon**. That certain Promissory Note Secured by Deed of Trust, dated September 28, 2005, in the original principal amount of $4,050,000.00. The loan evidenced by the foregoing note shall be referred to as the "Bundy Canyon Loan." The Bundy Canyon Loan is secured by a deed of trust on real property located in the State of California. As of June 1, 2007, the total amount due under such note, exclusive of attorneys' fees and other possible costs due under such note or loan documents in relation to such note was $5,518,397.00. Such amount consists of the following: unpaid principal in the amount of $4,250,000.00; unpaid interest in the amount of $1,007,469.00; and unpaid late charges of $260,928.00. Compass holds the following fractional interest in the Bundy Canyon Loan and the note which evidences that loan: 0.7059%, or an interest in $30,000.00 of the principal amount of such loan.

**Copper Sage Commerce Center Phase II**. That certain Promissory Note Secured by Deed of Trust, dated March 1, 2006, in the original principal amount of $3,550,000.00. The loan evidenced by the foregoing note shall be referred to as the "Copper Sage Loan." The Copper Sage Loan is secured by real property located in the State of Nevada. As of June 1, 2007, the total amount due under such note, exclusive of principal, attorneys' fees, and other possible costs due under such note or loan documents in relation to such note, consists of the following amounts: unpaid interest in the amount of $825,333.50; unpaid late charges of $40,157.23; and unpaid origination fees in the amount of $56,500.00. Compass holds the following fractional interest in the Copper Sage Loan and the note

1    which evidences that loan: 1.8310%, or an interest in $65,000.00 of the principal amount

2    of such loan.

3        **Cornman Toltec 160, LLC**. That certain Promissory Note Secured by Deed of

4    Trust, dated June 24, 2005, in the original principal amount of $5,400,000.00. The loan

5    evidenced by the foregoing note shall be referred to as the "Cornman Toltec Loan." The

6    Cornman Toltec Loan is secured by real property located in the State of Arizona. As of

7    June 1, 2007, the total amount due under such note, exclusive of attorneys' fees and other

8    possible costs due under such note or loan documents in relation to such note, was

9    $7,508,118.00. Such amount consists of the following: unpaid principal in the amount of

10   $6,375,000.00; unpaid interest in the amount of $772,444.00; and unpaid late charges of

11   $360,674.00. Compass holds the following fractional interest in the Cornman Toltec Loan

12   and the note which evidences that loan: 0.0784%, or an interest in $5,000.00 of the

13   principal amount of such loan.

14       **Southern California Land 2nd**. That certain Promissory Note Secured by Deed

15   of Trust, dated August 3, 2005, in the original principal amount of $2,300,000.00. This

16   loan was secured by a junior second deed of trust on real property located in the State of

17   California. On July 5, 2007, the senior trust deed foreclosed, and this loan became a

18   "foreclosed junior." As of June 1, 2007, the total amount due under such note, exclusive

19   of attorneys' fees and other possible costs due under such note or loan documents in

20   relation to such note, was $3,048,627.93. Such amount consists of the following: unpaid

21   principal in the amount of $2,800,000.00; unpaid interest in the amount of $99,869.36;

22   and, unpaid late charges of $148,758.57. Compass holds the following fractional interest

23   in the Southern California Land 2nd Loan and the note which evidences that loan:

24   1.2500%, or an interest in $35,000.00 of the principal amount of such loan.

25       **Barusa**. That certain Promissory Note Secured by Deed of Trust, dated

26   November 24, 2003, in the original principal amount of $12,580,000. The loan evidencedf

27   by the foregoing note shall be referred to as the "Barusa Loan." The Barusa Loan is

28

{00412799;}                                25                                223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1   secured by a deed of trust on real property located in the State of California. As of June 1,

2   2007, the total amount due under such note, exclusive of attorneys' fees and other possible

3   costs due under such note or loan documents in relation to such note, was $17,953,874.84.

4   Such amount consists of the following: unpaid principal in the amount of $15,300,000.00;

5   unpaid interest in the amount of $1,429,664.55; unpaid late charges of $841,710.29; and

6   unpaid extension fees in the amount of $382,500.00. Compass holds the following

7   fractional interest in the Barusa Loan and the note which evidences that loan: 0.0654%, or

8   an interest in $10,000.00 of the principal amount of such loan.

9        **Fiesta Oak Valley**. That certain Promissory Note Secured by Deed of Trust, dated

10  June 15, 2004, in the original principal amount of $20,500,000.00. The loan evidenced by

11  the foregoing note shall be referred to as the "Fiesta Oak Valley Loan." The Fiesta Oak

12  Valley Loan is secured by a deed of trust on real property located in the State of

13  California. As of June 1, 2007, the total amount due under such note, exclusive of

14  attorneys' fees and other possible costs due under such note or loan documents in relation

15  to such note, was $33,844,708.93. Such amount consists of the following: unpaid

16  principal in the amount of $20,500,000.00; unpaid interest in the amount of

17  $11,756,974.59; and, unpaid late charges of $1,587,734.34. Compass holds the following

18  fractional interest in the Fiesta Oak Valley Loan and the note which evidences that loan:

19  0.0463%, or an interest in $9,500.00 of the principal amount of such loan.

20       Compass holds the personal guaranties of Milanowski under which he

21  unconditionally guaranteed payment of each of the Compass Notes ("Compass

22  Guaranties"). Each of the Compass Guaranties is summarized below. Each of the

23  Compass Guaranties was in the files and records transferred to Compass at the time of the

24  closing of the purchase by Compass of the Loan Servicing rights and other Compass

25  Assets. Compass holds the original of each of the Compass Guaranties.

26       (a)    **Bundy Canyon**. That certain Guaranty dated as of September 28, 2005,

27  executed by Milanowski.

28
{00412799;}                                26                              223740.7

1      (b)    **Copper Sage Commerce Center Phase II**. That certain Unconditional

2  Repayment and Completion Guaranty dated as of June 9, 2004, executed by Milanowski.

3      (c)    **Cornman Toltec 160, LLC**. That certain Unconditional Guaranty dated as

4  of June 24, 2005, executed by Milanowski.

5      (d)    **Southern California Land 2nd**. That certain Unconditional Guaranty dated

6  as of August 3, 2005, executed by Milanowski.

7      (e)    **Barusa**. That certain Unconditional Guaranty dated as of November 24,

8  2003, executed by Milanowski.

9      (f)    **Fiesta Oak Valley**. That certain Guaranty dated as of June 15, 2004,

10  executed by Milanowski.

11      On or about May 15, 2007, a certain group calling themselves the "Lenders

12  Protection Group" sent out notices to borrowers on certain loans for which Compass had

13  acquired the servicing rights in the USA Bankruptcy Cases. Such notices purported to

14  replace Compass as the loan servicer. In the USA Bankruptcy Cases, Compass thereafter

15  filed, on May 25, 2007, a "Motion of Compass Financial Partners LLC for Order Pursuant

16  to 11 U.S.C. Sections 105 and 1141 Enforcing Confirmation Order and for Civil Contempt

17  Sanctions" (the "Motion"). A hearing took place in the USA Bankruptcy Cases on

18  May 31, 2007 before this Court. On or about June 26, 2007, an order was entered in the

19  USA Bankruptcy Cases (the "June 26 Order"). In the June 26 Order, it was ordered that

20  pending further order of the Court, the status quo as of May 15, 2007 is preserved such

21  that Compass shall be and shall remain the loan servicer with respect to all loans for which

22  it acquired servicing rights pursuant to the APA. It was further ordered that, pending

23  further order of the Court, all amounts due and owing under and in connection with the

24  loans that were the subject of the APA shall continue to be paid to Compass.

25  ///

26  ///

27  ///

28

{00412799;}                    27                223740.7

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1    On June 20, 2007, this Court conducted a further continued hearing on the Motion

2    of Compass. By order entered August 1, 2007, this Court again ordered that, pending

3    further order of the Court, Compass shall be and shall remain the loan servicer with

4    respect to the Compass Loans, and that all amounts due and owing under and in

5    connection with the Compass Loans shall continue to be paid to Compass.

6        With the June 26 Order and the August 1 Order entered by this Court, Compass is

7    the only servicer entitled to service the Compass Loans and take actions to pursue

8    collection of the Compass Loans. As a result of the hearing on June 20, 2007, the only

9    restriction on such rights to service the Compass Loans is that prior to August 17, 2007,

10   Compass shall not complete a foreclosure sale of any real property without an order of the

11   Court. Other than that restriction, it is Compass and only Compass that has the rights to

12   service the Compass Loans and to pursue all rights in connection with the Compass Loans.

13       The Copper Sage Loan is secured by real property located in the State of Nevada.

14   The servicing operations of Compass with respect to the Copper Sage Loan are now being

15   operated out of Compass' New York office.

16       The Cornman Toltec Loan is secured by real property located in the State of

17   Arizona. Compass is servicing this loan out of Compass' New York office.

18       The other four loans that comprise the Loans are secured by real property located in

19   the State of California. On or about May 18, 2007, Compass entered into a Subservicing

20   Agreement with Howard Zisblatt ("Zisblatt") with respect to the Compass Loans

21   purchased under the APA where such loans are secured by real property located in the

22   State of California ("Compass California Loans"). Such agreement is hereinafter called

23   ///

24   ///

25   ///

26   ///

{00412799;}                        28                        223740.7

the "Subservicing Agreement". Zisblatt holds a real estate broker's license issued by the California Department of Real Estate and is duly licensed to conduct a commercial mortgage loan servicing business to the extent that the conduct or operation of Compass' loan servicing is subject to such licensing with respect to the Compass California Loans. Each of the Compass California Loans is and was covered by the Subservicing Agreement.

On or about June 19, 2007, Compass FP Corporation, a Delaware corporation and an affiliate of Compass, obtained its own license as a corporation from the California Department of Real Estate.

Milanowski owes all of the amounts due on the Compass Loans without any need for a demand from Compass. Paragraph two of each of the Compass Guaranties provide that Milanowski binds himself "the same as if the Guarantor had contracted for payment thereof rather than the Borrower." As part of the Compass Guaranties, it is further provided that Milanowski agrees to be bound by and to perform all of the terms of all of the Compass Notes. In paragraph two of the Compass Guaranties, Milanowski waived any right to require Lender to first proceed against the borrower on the Compass Loans, any right to require Lender to exhaust collateral, and also waived "any right to require demand, protest, or receive notice of any kind including presentment, demand for performance or notice of non-performance, notice of dishonor … ."

### B.    Compass' Responses to Milanowski's Defenses

#### 1.    Compass is a Qualified Petitioning Creditor

The Trial Declaration of David Blatt (the "Blatt Declaration") establishes as a matter of law all that is needed for a valid involuntary petition against Milanowski.[16] Counsel for Milanowski chose not to examine Mr. Blatt at a pretrial deposition and, according to the ruling of this Court, such declaration may therefore be received without any cross examination at trial. *See* Joint Pretrial Order, at 34-35. Therefore, all of the testimony in the Blatt Declaration should be admitted into evidence. In addition, no

---

[16] Undefined capitalized terms used in this portion of the Brief shall have the meanings given to them in the Blatt Declaration.

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1   objection was propounded by Milanowski to any of the documents attached to the Blatt

2   Declaration, and they should all appropriately be admitted into evidence as well.

3        The evidence contained in the Blatt Declaration demonstrates that the petition of

4   Compass alone, without considering any of the other Petitioners, is sufficient to support

5   the involuntary filing. Whether the Court considers Compass as one creditor or six

6   creditors, the requirements of Bankruptcy Code Section 303(b)(1) are satisfied. As the

7   Blatt Declaration makes clear, Compass is a "servicer" servicing six different Compass

8   Loans, and, in addition, is a Direct Lender in each of those six loans. The six Compass

9   Loans, each of which is supported by the Compass Guaranties are evidenced by six

10  different Compass Notes. Those Compass Notes are attached to the Blatt Declaration as

11  Exhibits B-G [Pet. Ex. 73-78]. Attached to the Compass Notes are the names of each of

12  the Direct Lenders (in addition to Compass) for each of the six Compass Loans. There are

13  different Direct Lenders for each of the six Compass Notes. As a result, each group of

14  Direct Lenders under the six Compass Notes is respectively an "entity" within the meaning

15  of Section 303 of the Bankruptcy Code. Accordingly, Compass as servicer has filed the

16  petition on behalf of six different entities, and this filing is itself sufficient to support the

17  involuntary petition.

18       In the USA Bankruptcy Cases, this Court has confirmed that Compass is and shall

19  remain the loan servicer for all of the loans which it purchased, including the Compass

20  Loans and the Compass Notes, pending further order of the Court. Blatt Declaration, ¶ 13.

21  The Court also held that pending further order of the USA Bankruptcy Court all amounts

22  due and owing in connection with the loans that were the subject of the APA shall

23  continue to be paid to Compass. *Id.* at ¶¶ 13-16. The only restriction placed on the ability

24  of Compass to service the Compass Loans is that with respect to any real estate collateral

25  held for the Compass Notes, Compass may not complete a foreclosure sale of real property

26  without further order of the USA Bankruptcy Court. *Id.* at ¶ 16.

27

28

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

1   The LSAs with respect to the six Compass Notes and Compass Loans are all
2   substantially in the same form. Blatt Declaration, ¶ 12. Examples of the LSAs for each of
3   the six Compass Notes and Compass Loans are attached to the Blatt Declaration as
4   Exhibits "N" to "S" [Pet. Ex. 87 to 92]. Paragraph 11 of the LSAs provides that the
5   servicer is given the full power and authority and is appointed as the Direct Lender's
6   attorney-in-fact "to do all things and take all actions on behalf of Lender which are
7   necessary or convenient . . . to protect Lender's interest under any note, deed of trust,
8   guaranty, security agreement or other document pertaining to any Loan." *Id.* This
9   language, without more, gives Compass the power to pursue the Compass Guaranties and
10  to file an involuntary petition to take action necessary to protect the interest of the Direct
11  Lenders under the Compass Guaranties. There are other provisions of the LSA which
12  gave Compass these rights. Paragraph 2(c)(ii) of the LSAs provides that if the borrower
13  does not make any payment of the Compass Notes when due, Compass may take steps to
14  collect payment, including "obtaining representation for Lender in litigation and
15  bankruptcy proceedings." Paragraph 2(c)(ii) further provides that Compass may also "take
16  steps to collect the payment . . . as deemed necessary or appropriate by [Compass] in its
17  business judgment to fully protect the interests of the Lender . . .." In addition, Paragraph
18  4 of the LSAs provides, among other things, that any legal proceeding instituted by
19  Compass pursuant to the LSA may be pursued in Compass' name only or as agent for the
20  Lender.

21  Each of the claims that Compass has under each of the Compass Guaranties is non-
22  contingent. The Compass Guaranties are attached to the Blatt Declaration as Exhibits "H"
23  to "M" [Pet. Ex. 79 to 84]. All of the Compass Guaranties are similar. Each has all of the
24  traditional suretyship waiver provisions, and each is a guaranty of payment and not of
25  collection. Exhibit K to the Blatt Declaration [Pet. Ex. 82] is typical of the Compass
26  Guaranties. It provides that the Compass Guaranty is a guaranty of payment and
27  performance, not collection, and that Lender may resort to action against the guarantor

28  {00412799;}                          31                                      223740.7

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

Case 05-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 39 of 56

1  without notice or demand to the guarantor. [*Id.* at ¶ 7]. The guarantor waives any right to

2  require the lender to proceed against any other guarantors, [*id.* at ¶ 2(a)], against the

3  borrowers [*id.*], against security [*id.* at ¶ 2(b); ¶ 3; ¶ 7], and any right to raise lack of

4  authority of the lender to enforce a claim in bankruptcy. *Id.* at ¶ 2(d). The amount of each

5  of the six claims is greater than $12,300. Blatt Declaration, ¶ 10.

6       Since Compass holds, by virtue of the Compass Guaranties, six separate non-

7  contingent claims against Milanowski, each exceeding $12,300, and has the power to

8  pursue all matters relating to the Compass Guaranties under the LSA, the filing of the

9  involuntary petition was appropriate.

10              **2.    The Fact that the Notes Which Are the Subject of the
                        Guaranties Are Secured or Guaranteed By Others Is Not
11                      Relevant**

12       In the Joint Pretrial Order, Milanowski contends that the "claims are fully or

13  partially secured and are guarantied by certain third party guarantors." He argues that

14  creditors could resort to the collateral and guaranties to satisfy the claims, and therefore

15  the claims are contingent. First, none of the six Compass Guaranties is secured. Five of

16  the six notes which the Compass Guaranties cover are in fact secured. Blatt Declaration,

17  ¶ 10. However, whether the notes are secured is irrelevant. As set forth above, each of the

18  Compass Guaranties contains a complete waiver of any obligation of Compass to resort to

19  collateral, and further provides that a direct action may be brought against the guarantor

20  without demand.

21       One of the Compass Notes is no longer secured by collateral. As the Blatt

22  Declaration sets forth, Compass held a second deed of trust on the Southern California

23  Land second loan, until July 5, 2007. Blatt Declaration, ¶ 10(d). On that date, the senior

24  trust deed holder foreclosed and took title to the real property by trustee's deed. *Id.* at

25  ¶ 10(d). Under California law, in such a situation the lien of the junior deed of trust is

26  eliminated. 2 Bernhardt, Roger, CEB CALIFORNIA MORTGAGE AND DEED OF

27  TRUST PRACTICE § 9.41 (3d ed. 2007 update), *citing R-Ranch Markets #2, Inc. v. Old*

28  {00412799;}                                    32                                    223740.7

1   *Stone Bank,* 16 Cal.App.4th 1323, 1328 (1993). In that situation, the foreclosed junior's

2   claim becomes an unsecured claim against the Borrower. 1 Bernhardt, Roger, *supra* at §

3   5.3; *citing Brown v. Jensen*, 41 Cal.2d 193 (1953). Hence, as to the Southern California

4   Loan second, Compass holds an unsecured claim both against the borrower and

5   Milanowski.

6           **3.      The Actions of the Nevada Mortgage Lending Division**
            **With Respect to Compass Has No Impact on the Rights of**
7           **Compass to Pursue the Guaranties**

8           Milanowski alleges that the Nevada MLD has revoked the mortgage broker licenses

9   for Compass, and therefore Compass cannot act as servicer. Milanowski argues that

10  Compass cannot file the involuntary petition since its Nevada license was allegedly

11  "revoked." Milanowski is wrong in both instances.

12          First, the MLD did not revoke Compass's mortgage broker license. Compass

13  applied for a mortgage broker license in January 2007 but voluntarily withdrew its

14  application on April 20, 2007. Compass simply made a business decision that it made

15  more economic sense to service loans from Compass's main office in New York. Its

16  application was not denied, and it never held a license to be revoked. Milanowski's

17  defense, therefore, is without merit. Moreover, the Order Imposing Fine and Order to

18  Cease and Desist issued by the Mortgage Lending Division against Compass on May 9,

19  2007 (the "MLD Order") was not a denial or revocation of a license. The MLD Order

20  relates only to seven instances in which an employee of Compass mailed correspondence

21  to third parties that identified Compass as the servicer of the loan that was the subject of

22  the correspondence. The MLD asserted that the actions of Compass' employee violated

23  NRS 645A, which governs escrow agencies. The MLD Order does not refer or relate to

24  NRS Chapter 645B, the statutes governing mortgage brokers.

25          Second, nothing set forth in the APA requires that Compass be licensed as a

26  mortgage broker in the State of Nevada. The APA included a waivable condition

27  precedent to closing that Compass obtain an "interim license" from the MLD. Compass

28  {00412799;}                                    33                                      223740.7

1    voluntarily waived the condition precedent and closed the purchase and sale transaction

2    contemplated by the APA without obtaining a license from the MLD.

3         Third, Nevada law does not require one who services loans outside of the State of

4    Nevada to obtain a license from the MLD. The Commissioner of the MLD has

5    jurisdiction over mortgage brokers "doing business in this State." NRS 645B.060(1). The

6    Nevada legislature, in enacting NRS Chapter 645B, "did not intend licensure of out-of-

7    state locations for mortgage companies." Performance by a licensed mortgage broker of

8    certain functions at out-of-state locations is consistent with the general constitutional

9    provisions governing interstate commerce. Op. Nev. Atty. Gen. 98-33 (Nov. 6, 1998).

10        In any event (and to the extent relevant), five of the six Compass Loans serviced by

11   Compass and subject to Compass Guaranties are secured by property outside of Nevada.

12   Three of the loans are secured by California real property: Bundy Canyon; Barusa; and,

13   Fiesta Oak Valley. Blatt Declaration, ¶¶ 10(a), 10(e), 10(f). The Southern California

14   Land second loan was secured by California real property but is now an unsecured loan

15   since this loan became a "foreclosed junior." *Id.* at ¶ 10(d). The Cornman Toltec 160,

16   LLC Loan is secured by real property located in the state of Arizona. *Id.* at ¶ 10(d). Only

17   the Copper Sage Commerce Center Phase II Loan is secured by real property located in

18   Nevada. *Id.* at ¶ 10(b). Further, the Direct Lenders are residents of many states, and not

19   just Nevada.

20        Compass is licensed in California. The involuntary petition was filed by Compass

21   on July 3, 2007. As the Blatt Declaration makes clear, prior to that time and on June 19,

22   2007, Compass was licensed by the California Department of Real Estate. Blatt

23   Declaration, ¶ 20. Prior to that time, Compass had been operating with respect to

24   California loans under a subservicing agreement with a licensed California real estate

25   broker. *Id.* at ¶ 19. Therefore, any complaints of Milanowski with respect to licensing in

26   California are without merit.

27

28
     {00412799;}                              34                                      223740.7

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

1    In addition, Milanowski cites no cases in California to support any proposition that

2    the failure to obtain a license strips the servicer of the right to collect on notes and

3    guaranties. That is because there is none to cite. A person that acts as a real estate broker

4    without a license may be subject to punishment. CA Business and Professions Code

5    Section 10139. However, a person that collects payments that require a person to be

6    licensed (such as rents or loan payments) without being so licensed has no obligation to

7    return the payments to the payor, but may deliver the payments to the party for whom the

8    payments were intended. 25 CA AG Opinions 43, 46 (1955). It therefore follows that a

9    person's unlicensed status in no way abrogates a borrower's obligation to make loan

10    payments to that person, regardless of whether that person is licensed as a real estate

11    broker.

12        As to the Arizona loan serviced by Compass, a servicer need not be licensed if its

13    office is not located in that state. As the Blatt Declaration makes clear, Compass has no

14    offices in Arizona, and the loans are being serviced out of New York. Blatt Declaration,

15    ¶¶ 18 and 19. No license is needed for a loan servicer in the state of New York.[17]

16                    **4.    Compass Does Not Need a Further Power of Attorney to
17                         File the Involuntary Petition and Had Authority to So File
                              Under the Applicable Loan Servicing Agreements**

18        Milanowski alleges that Petitioners do not have a power of attorney under their loan

19    documents authorizing them to file an involuntary petition. This contention is false. As

20    set forth above, under Paragraph 11 of each of the LSAs, the Lender does appoint

21    Compass "as its true and lawful attorney-in-fact to...protect Lender's interest under any

22    note,…guaranty...or other document pertaining to any Loan." Blatt Declaration as

23    Exhibits "N" to "S" [Pet. Ex. 87 to 92]. That is all that is needed. The LSAs give full

24    authority to act, and no further delegation of authority or power of attorney is needed.

25    _____

26    [17] The only New York law that arguably applies is Section 590 of the New York Banking Law, which
governs "licensing." But that section only governs "mortgage loans." The term mortgage loan means "a
27    loan to a natural person made primarily for personal, family or household use, primarily secured by either a
mortgage on residential real property . . .." Section 590(1)(a). The plain language of this provision makes
28    clear that the Loans at issue here do not fall within that definition.

1  Paragraph 11 of the LSAs provides that on Compass' request each Lender agrees to
2  execute a power of attorney in recordable form before a notary. The provision of such
3  paragraph 11 makes clear that such further documentation is only "further evidence" of the
4  appointment of Compass as an attorney-in-fact. The use of the words "further evidence"
5  by the express language of the LSAs makes clear that the grant of the power of attorney to
6  Compass in the first sentence is all that is needed to pursue the Compass Guaranties. Any
7  other reading of the LSAs ignores their plain meaning. A clear reading of the LSAs shows
8  that Section 2(c) obligates Compass to take steps to collect all payments in default, to
9  foreclose, to collect both Compass Notes and Compass Guaranties upon a default, and to
10  represent the Direct Lenders in bankruptcy proceedings. Therefore it is clear that the
11  power of attorney given under section 11 of the LSAs is given in connection with all of the
12  duties of Compass as loan servicer, including the duties to collect the Compass Notes and
13  the Compass Guaranties. In any event, Milanowski can hardly argue that Compass, as
14  servicer, has no power of attorney from Compass, as Direct Lender, even if he makes such
15  an argument as to the non-Compass Direct Lenders.

16          The Nevada Supreme Court has held that "[a] contract should be construed, if
17  logically and legally permissible, so as to effectuate valid contractual relations, rather than
18  in a manner which would render the agreement invalid, or render performance
19  impossible." *Vosburg Equipment v. Zupancic*, 103 Nev. 266, 737 P.2d 522, 523 (1987),
20  *citing Reno Club, Inc. v. Young Inv. Co.*, 64 Nev. 312, 325, 182 P.2d 1011, 1017 (1947).
21  The Court has also adopted and enforced the rule of construction or interpretation that a
22  contract "should not be construed to lead to an absurd result", but that it "should be given
23  a reasonable and fair interpretation." *Reno Club*, 64 Nev. at 325, 182 P.2d at 1017.

24          Following the guidance of the Nevada Supreme Court, the only way to construe the
25  LSAs is to construe them such that the power granted to Compass under section 2(c) of the
26  LSA is consistent with the power of attorney under section 11.

In addition, a power of attorney is not needed to be a loan servicer or collect on a loan. As set forth above, even without the grant of the power of attorney, the LSAs in paragraph 2 clearly give to Compass the right to collect on the Compass Loans and the Compass Guaranties.

Even if the grant of the power of attorney is improper or not complete (which it is not) the grant of power to pursue the Loans in paragraph 2 of the LSA is all that is needed. Under paragraph 10 of the LSAs, the "Integration Clause" it is clearly provided that "[t]he invalidity of any portion of this agreement shall in no way affect the balance thereof." Therefore, assuming that the grant of the power of attorney in paragraph 11 is incomplete or invalid, such invalidity does not impact the grant of power to Compass to pursue the Compass Notes and the Compass Guaranties granted under paragraph 2 of the LSAs.

### 5. There Is Sufficient Information to Determine How Compass Calculated Its Claim

Milanowski contends that he does not have sufficient information to determine the specific amount of Compass' claim. This contention is without merit. In Paragraph 10 of the Blatt Declaration, Compass sets forth in detail the specific amounts due under each of the Compass Loans. Milanowski has had the chance to question Blatt about this, to conduct discovery on the amounts and has failed to do so. In any case, the amounts due in each case are clearly greatly in excess of $12,300 for each loan.

## VI.   Other Elements of Section 303

Here are the facts with respect to the other elements of 11 U.S.C. § 303.

### A.   Number of Eligible Milanowski Creditors

The Petitioners assert they are eligible creditors. Compass, as servicing agent on six loans, asserts the rights of the Direct Lenders on those loans and thus may be deemed six petitioning creditors. USACM Trust likewise is asserting rights as servicing agent on two loans, and as the direct lender on a third account receivable, and thus may be deemed three creditors. DTDF, Nevada State Bank, and Hesperia each assert one eligible claim.

LEWIS
AND
ROCA
——LLP——
L A W Y E R S

The Petitioners do not expect that Milanowski will present proof of other eligible creditors, having asserted Milanowski's Fifth Amendment right not to testify about these issues in answers to interrogatories, and having listed no such evidence in the Joint Pretrial Order. Milanowski's answer to the involuntary petition alleges that he "has more than 12 creditors." (D118 ¶ 4). It does not allege that he has more than 12 eligible creditors, and the allegation is not evidence in any event. Further, Milanowski has not established that he has 12 or more creditors of any sort, since he has not complied with the requirement of Bankruptcy Rule 1003(b) to list all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof to accompany his allegation that he has more than 12 creditors.

**B.     Milanowski Is Generally Not Paying His Debts As They Come Due**

The Petitioners have established 11 substantial debts held by five creditors, with total principal outstanding of well in excess of $60 million, wholly apart from accrued and unpaid interest and costs. Milanowski has asserted his Fifth Amendment right not to testify with respect to payment of his debts as they fall due.

## ARGUMENT

**I.     The Burden of Proof and Effect of Milanowski's Exercise of Fifth Amendment Rights.**

    **A.     Petitioners Have The Initial Burden of Proof on Their Claims and the Elements of § 303. Milanowski Has the Burden Of Proof as to the Number of Eligible Debts, his Affirmative Defenses, Including Bona Fide Disputed Claims.**

Petitioning creditors bear the burden of proof to show that no bona fide dispute exists as to the requisite petitioning claims. *Vortex*, 277 F.3d at 1064, citing *In re Rubin*, 769 F.2d 611, 615 (9th Cir. 1985). Other courts have parsed this requirement more precisely. The initial burden rests on the petitioning creditors to establish a prima facie case that no bona fide dispute exists as to their claims. Once that prima facie case is made, but burden shifts to the debtor to demonstrate the existence of a bona fide dispute. *In re Byrd*, 357 F.3d 433, 437, 439 (4th Cir. 2004); *In re BDC 56, LLC*, 330 F.3d 111, 118 (2d Cir. 2003); *In re Sims*, 994 F.2d 210, 221 (5th Cir. 1993); *In re Rimell*, 946 F.2d 1363,

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1  1365 (8ᵗʰ Cir. 1991); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1544 (10ᵗʰ Cir.

2  1988).

3      Milanowski has the burden of proving that he has twelve or more eligible creditors,

4  such that three or more eligible creditors must join the involuntary petition. *In re Crown*

5  *Sportswear, Inc.*, 575 F.2d 991, 993 (1ˢᵗ Cir. 1978) (burden on debtor to specify number

6  and identity of creditors when challenging involuntary petition). He also bears the burden

7  of proof with respect to the affirmative defenses he has alleged. *See Id.* at 994 (allegation

8  of petitioning creditors' bad faith). These affirmative defenses include his allegations of

9  agreed forbearance on collection of the DTDF loan, requirement to look to collateral or

10 other guarantors before the Petitioning Creditors could pursue Milanowski on guaranties,

11 and lack of standing of loan servicers to pursue collection of loans under LSAs.

12  **B.    The Court May Make Adverse Inferences from Milanowski's Assertions of Fifth Amendment Rights.**

13     Milanowski has no evidence to support his mere allegations of timely payment of

14 debts and existence of more than 12 eligible creditors, and has asserted his Fifth

15 Amendment privilege against self-incrimination in responding to discovery asking about

16 these very allegations. [Pet. Ex. 42]. The Petitioners anticipate he will testify in the same

17 way, if he testifies at all (not having listed himself as a witness in the Joint Pretrial Order).

18     This Court may draw an adverse inference from Milanowski's assertion of Fifth

19 Amendment rights in refusing to testify. As the Ninth Circuit explained:

20     Parties are free to invoke the Fifth amendment in civil cases, but the court is
21     equally free to draw adverse inferences from their failure of proof. *See
       Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *United States v. Solano-
22     Godines*, 120 F.3d 957, 962 (9ᵗʰ Cir. 1997).

23 *Securities and Exchange Commission v. Colello*, 139 F.3d 674, 677 (9ᵗʰ Cir. 1998).

24     The First Circuit Bankruptcy Appellate Panel has considered a debtor's refusal to

25 testify on Fifth Amendment grounds in the context of an involuntary bankruptcy petition

26 where the debtor contended the petitioning creditors' claims were in bona fide dispute. *In*

27 *re Dilley*, 339 B.R. 1, 7 (1ˢᵗ Cir. BAP 2006). The BAP held that the petitioning creditors

28 met their initial burden of making a prima facie case for valid claims, measured by the

{00412799;}                                    39                                    223740.7

1    same "objective" test used in the Ninth Circuit. It held that an adverse inference could be

2    drawn from the debtor's refusal to testify, and that the Fifth Amendment does not permit a

3    debtor to evade his burden of overcoming the creditors' prima facie case with his own

4    proof of a bona fide dispute. *Id.* Likewise, here, the adverse inferences that may be drawn

5    from Milanowski's refusal to testify on Fifth Amendment grounds, in conjunction with the

6    affirmative evidence of substantial unpaid indebtedness presented by the Petitioners,

7    justifies a conclusion by this Court that Petitioners have met their burden of proof.

8    Alternatively, the Court need not draw any adverse inferences if Milanowski

9    merely fails to support his allegations with admissible evidence as the Court may then rule

10   on the narrower basis of failure of proof.

11   **II.    The Petitioners' Claims Are Not Conditional as to Liability or the Subject of a Bona Fide Dispute as to Liability or Amount.**

12   Milanowski argues that his liability under Petitioners' guaranties is conditional, and

13   that the Petitioners must pursue collection from loan principals or loan collateral first,

14   despite broad waivers of any such conditions in the guaranties themselves.

15   The interpretation and enforcement of Milanowski's guaranties of the Petitioners'

16   debts is governed by Nevada law, except for the DTDF 10-90 Loan and the 10-90

17   Guaranty, which is governed by California law. "Matters bearing upon the execution, the

18   interpretation, and the validity of a contract are determined by the law of the place where

19   the contract is made." *Van Dyke v. Parker*, 83 F.2d 35, 37 (9th Cir. 1936), quoting

20   *Scudder v. Union Nat'l Bank*, 91 U.S. 406, 412-13 (1875). While the dischargeability of

21   debts in bankruptcy is governed by federal law, the existence and validity of a debt is

22   determined by reference to state law. *Mandalay Resort Group v. Richard Bradley Miller*,

23   292 B.R. 409 (9th Cir. 2003). Congress did not intend to preempt state law on this point.

24   *Id.* Each of the guaranties was made in Nevada, except possibly the 10-90 Guaranty.

25   Each of the guaranties contains choice of law clauses in which the parties agreed that

26   Nevada law governed their interpretation and enforcement, except for the 10-90 Guaranty

27   which expressly provides for the applicability of California law.

28   {00412799;}

223740.7

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

**A.   Under Nevada Law, Unconditional Guaranty Terms Are Enforceable, and Parol Evidence Is Not Admissible to Attempt to Show That Guaranties Are Conditional.**

The plain, unambiguous language of Milanowski's guaranties of the Petitioners' debts provides that Milanowski unconditionally guaranteed payment in full.  Under Nevada law, Milanowski is not permitted to introduce parol evidence to contradict the plain and unambiguous language of the guaranties.  Indeed, for more than a century, the Nevada Supreme Court has held that parol evidence is inadmissible.  "When parties reduce a contract to writing, all prior oral negotiations and agreements are merged in the writing, and the instrument must be treated as containing the whole contract, and parol [evidence] is not admissible to alter its terms." *Gage v. Phillips*, 21 Nev. 150, 153, 26 P. 60 (1891).  Parol evidence is not admissible to vary or contradict the terms of a written agreement. *Lowden Inv. Co. v. General Electric Credit Co.*, 103 Nev. 374, 379, 741 P.2d 806 (1987).

Extrinsic evidence may not be admitted to explain the meaning of a written instrument when the language of the instrument is unambiguous and not reasonably susceptible to more than one meaning.  In the absence of ambiguity, no outside evidence is allowed. *See Ringle v. Bruton*, 120 Nev. 82, 90-91, 86 P. 3d 1032, 1037-38 (2004).  Where a written contract is clear and unambiguous on its face, extraneous evidence cannot be introduced to explain its meaning and the term of the agreement must be construed from its language. *Kaldi v. Farmer's Insurance*, 117 Nev. 273, 282; 21 P. 3d 16, 22 (2001); *Southern Trust Mortgage Co. v. K&B Door Co., Inc.*, 104 Nev. 564, 568, 763 P.2d 353 (1988).  Courts are not at liberty to insert or disregard words in a contract. *Royal Indemnity Co. v. Special Services Supply Co.*, 82 Nev. 148, 150, 413 P.2d 500 (1966).

In *Daly v. Del E. Webb Corp.*, 609 P.2d 319, 320 (Nev. 1980), officers of the Aladdin Hotel Corporation guaranteed promissory notes executed by Aladdin in favor of Del Web.  The guaranty stated that the guarantors "unconditionally guaranteed payment in full." *Id.*  Despite such language, the guarantors asserted that the guaranty was unenforceable due to oral evidence of a condition precedent to the guaranties, namely that

LEWIS
AND
ROCA
—LLP—
L A W Y E R S

Case 06-13162-lbr    Doc 146    Entered 08/03/07 17:52:42    Page 49 of 56

certain repairs be made to the hotel. *Id.* In holding that the oral evidence was inadmissible under the parol evidence rule, the Nevada Supreme Court noted that the guaranty was by its very terms, unconditional, and that the attempted introduction of oral evidence to the contrary was simply an effort to change an unconditional obligation to a conditional one. Quoting *Gage*, the court held that all oral negotiations and agreements were merged in the guaranty, and parol proof was not admissible to alter its terms, or to show that, instead of being an absolute obligation, it was conditional. *Id.*

**B.**    **Milanowski's Waiver of Conditions to Enforceability of the Nevada Guaranties is Legally Effective in Nevada**

Under Nevada law, waivers contained within personal guarantees, are effective. In *Brunzell v. Golden Gate National Bank*, 85 Nev. 345, 455 P.2d 31 (1969), the Nevada Supreme Court rejected the argument of a guarantor that his continuing guaranty was no longer effective as notice of a change in the documentation memorializing the underlying obligation was not provided to the guarantor. The underlying borrower had originally executed two notes in favor of the bank, each in the amount of $20,000. Subsequent to execution of a continuing guaranty by Brunzell, the bank cancelled the two notes in favor of one note in the amount of $40,000. Following default on the note, and demand by the bank for payment by the guarantor, the guarantor argued that his continuing guaranty was no longer effective as notice of the re-documentation of the note was not given to him.

The Nevada Supreme Court rejected the argument on the grounds that the obligation to provide notice had been waived by the guarantor in the continuing guaranty. The Court ruled that the guarantor's lack of notice argument was "meritless" in light of the waivers in the continuing guaranty, which provided that the guarantor waived "all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, and notices of acceptance of this guaranty and of the existence, creation or incurring of new or additional indebtedness." *Id.*

In addition, NRS 104.3605(9) provides that a guarantor is not discharged from liability if the guaranty either specifically or by general language indicates waiver of

1    defenses based on suretyship or impairment of collateral.[18]  In fact, comment 2 to this

2    statute provides that the importance of suretyship defenses is greatly diminished by the

3    fact that they can be waived.

4        Waivers contained within guarantees also are effective in Nevada when the

5    underlying obligation is secured by real property.  NRS 40.495 expressly provides that,

6    with certain exceptions, a guarantor may waive the provisions of NRS 40.430 (Nevada's

7    "one action rule") and a separate action for the enforcement of the guarantor's obligation

8    to pay an indebtedness secured by a mortgage or lien upon real property may be

9    maintained, separately and independently from any action to foreclose upon a mortgage or

10   lien and the indebtedness or obligation secured thereby.

11   **C.    Milanowski's Waiver of Conditions to Enforceability in the 10-90 Guaranty Is Effective Under California Law**

12       In the 1993 case of *Cathay Bank v. Lee*, 14 Cal. App. 4th  (Cal. Ct. App. 1993), a

13   California Court of Appeal ruled that the language of a *Gradsky* waiver[19] contained within

14   the guaranty in question was not sufficiently explicit to be effective.  As a result of this

15   case, the California legislature enacted legislation dealing with guarantor waivers in

16   general, and *Gradsky* waivers in particular, that confirmed the effectiveness of such

17   waivers.  That legislation is codified as California Civil Code §2856.

18       California Civil Code §2856 provides in relevant part:

19

20   [18] A party is not discharged under this section if:

21

22       (b) The instrument or a separate agreement of the party provides for waiver of discharge under this section either specifically or by general language indicating that parties waive defenses based on suretyship or impairment of collateral.

23   [19] So named by reference to the case of *Union Bank v. Gradsky*, 265 Cal. App. 2d 40, 71 Cal. Rptr. 64

24   (1968), which held that a real property secured lender was estopped to recover against a guarantor where that lender elected to proceed to foreclose against the real property collateral non-judicially, thereby

25   forgoing under California law its right to pursue the borrower for a deficiency judgment, and in the process, eliminating the ability of the guarantor to be subrogated to the secured lender's right to a

26   deficiency judgment after payment by the guarantor of the principal obligation.  The court noted that the guarantor could waive such defense based upon the secured lender's election of remedies with a properly

27   worded waiver within the guaranty agreement.  DTDF does not rely upon a *Gradsky* waiver in the 10-90 Guaranty since DTDF unfortunately is not secured by real property on the 10-90 Loan.  Rather, DTDF

28   relies upon the more standard waivers contained in the 10-90 Guaranty.

{00412799;}                                   43                                   223740.7

(a) ***Any guarantor*** or other surety, including a guarantor of a note or other obligation secured by real property or an estate for years, ***may waive*** any or all of the following:

(1) The guarantor or other surety's ***rights of subrogation, reimbursement, indemnification, and contribution and any other rights and defenses that are or may become available to the guarantor or other surety by reason of Sections 2787 to 2855, inclusive***.

(2) Any rights or defenses the guarantor or other surety may have in respect of his or her obligations as a guarantor or other surety by reason of ***any election of remedies by the creditor***. (emphasis added).

Included within the scope of the waivable provisions of California Civil Code §§ 2787 to 2855 referenced above, is Civil Code § 2845 which, absent waiver, would allow the guarantor to demand that the creditor first proceed against the borrower or collateral for the debt.[20]

Finally, to the extent that Milanowski seeks to introduce parol evidence of conditions to his liability on the 10-90 Guaranty, in addition to the arguments regarding the parol evidence rule set forth elsewhere herein, California Civil Code § 2806 deals specifically with the issue by providing: "A suretyship obligation is to be deemed unconditional unless its terms import some condition precedent to the liability of the surety."

Thus, the waivers agreed to by Milanowski within the provisions of the 10-90 Guaranty are fully effective under California law.

## D.    There Is No Bona Fide Dispute Over Any Of Petitioners' Claims

The Court is to determine whether a debtor's dispute over a creditor's claim is bona fide by an objective test. *Vortex*, 277 F.3d at 1064. An unliquidated claim, such as a personal injury tort claim, may be disputed objectively; claims based on written contracts like Milanowski's notes and guaranties are objectively determinable, and cannot be the subject of a bona fide dispute over amount. *See* NORTON BANKRUPTCY LAW AND

---

[20] The full text is as follows: "A surety may require the creditor, subject to Section 996.440 of the Code of Civil Procedure, to proceed against the principal, or to pursue any other remedy in the creditor's power which the surety cannot pursue, and which would lighten the surety's burden; and if the creditor neglects to do so, the surety is exonerated to the extent to which the surety is thereby prejudiced."

{00412799;}                                    44                                    223740.7

1   PRACTICE 2D § 21.3 at 21-9 (The 2005 BACPA amendment requiring no bona fide

2   dispute as to amount as well as liability "shall not exclude, however, claimants holding

3   contractual claims where the amount of the claim is subject to a calculation that itself is

4   not subject to a bona fide dispute").

5          It is unclear whether Milanowski contends that there is a bona fide dispute about

6   the amount of any of Petitioners' claims. Even if he does so contend, the Court should

7   overrule such contention. As the Court is well aware, the BAPCPA amendments

8   disqualify a petitioning creditor if there is a bona fide dispute as to the amount of the

9   claim. 11 U.S.C. § 303(b)(1). Prior to BAPCPA, only bona fide disputes as to liability

10  served as disqualifiers. However, the disputes as to amount become relevant only if the

11  amount in dispute, if resolved in favor of the alleged debtor, would reduce the amount of

12  the eligible claims of petitioning creditors to below the $12,300 minimum of 11 U.S.C.

13  § 303(b)(1) and (b)(2). Thus, for example, if Milanowski were to establish a bona fide

14  dispute about the amount of interest or attorney fees owing on the 10-90 Loan but the

15  Court were to find that there was no dispute as to the amount of principal owing (*i.e.*,

16  $55,113,781 – somewhat above the $12,300 minimum), the Court should conclude that the

17  alleged dispute as to amount is irrelevant. This precise issue was determined in favor of

18  the petitioner in *In re DemirCo Holdings, Inc.*, 2006 WL 1663237 (Bankr. C.D.Ill. 2006) ,

19  where the court held that for a bona fide dispute to be relevant regarding the claim amount,

20  such dispute must at least have the potential to reduce the total of the petitioner's claim to

21  an amount below the statutory threshold. *Id.* at *3. *DemirCo Holdings* cites *Focus Media*

22  in support of the proposition that the dispute must be relevant. *Id.*, citing *In re Focus*

23  *Media, Inc.*, 378 F.3d 916 (9th Cir. 2004).

24  **III.    If Only One Of The Petitioners' Claims Is Eligible, Then Milanowski Has Fewer Than 12 Eligible Creditors. If All Are Eligible, Then There Are More**

25  **Than Enough Petitioning Creditors.**

26  **A.    Milanowski Has Offered No Proof That He Has Any Eligible Claims**

27         A debtor can waive the requirement for three eligible petitioning creditors by

28  failing to contest it in his answer to the involuntary petition. *In re Mason*, 709 F.2d 1313,

{00412799;}                                    45                                    223740.7

1318-19 (9th Cir. 1983), followed in *Rubin*, 769 F.2d at 614 n.3. Milanowski's bald allegation in his answer that he has more than 12 creditors does not allege or establish more than 12 eligible creditors. He has not submitted any evidence, and has failed to provide even a list of creditors. In *Rubin*, the Court overruled imposition of a sanction in the form of a waiver of the debtor's contention of more than 12 eligible claims because he filed his creditor list 15 days late. *Rubin*, 769 F.2d at 613, 619. Milanowski has never filed such a list, or produced any other evidence, and accordingly has waived the argument that he has 12 or more eligible creditors.

> **B.    One Eligible Claim Is Enough, But If All Are Eligible, They Are Enough**

If Milanowski has less than 12 creditors that are (a) not insiders, (b) not employees, (c) not transferees of avoidable transfers, (d) with claims that are not contingent or the subject of a bona fide dispute as to liability or amount, then any one of the Petitioners' claims would suffice to commence this bankruptcy case, since each of them exceeds $12,300. 11 U.S.C. § 303(b)(1), (2). Milanowski has not established that he has 12 or more such creditors. To the extent Milanowski successfully challenges the eligibility of any of the Petitioners' claims, it simply reduces the number of claims below 12 even further. As long as just one of the claims meets the eligibility standard, the petition succeeds on this element.

**IV.    Milanowski Is Generally Not Paying His Debts As They Become Due.**

> **A.    The Ninth Circuit Standard**

The Ninth Circuit employs a "totality of the circumstances" test for determining whether a debtor is generally paying its debts as they become due. *Focus Media*, 378 F.3d at 928-29.

> Thus, "[a] finding that a debtor is generally not paying its debts 'requires a more general showing of the debtor's financial condition and debt structure than merely establishing the existence of a few unpaid debts.'" *Vortex*, 277 F.3d at 1072 (quoting *Dill*, 731 F.2d at 632). In *Vortex*, for example, we held that the bankruptcy court did not clearly err in finding that Vortex was generally paying its debts as they became due, where "Vortex ha[d] been paying off the debts it ha[d] incurred, including a full settlement of the IRS deficiency that was assessed."

*Focus Media*, 378 F.3d at 928-29.


**B.  Milanowski Has Offered No Proof that He Is Paying Any of His Debts as They Come Due**

The Petitioners' evidence establishes that Milanowski has not paid *any* of the multiple debts to them, including but not limited to the 10-90 Loan obligation, the principal amount of which exceeds $55 million.  Conversely, there is no evidence that Milanowski has paid even *one* of his debts as it came due.  Petitioners sought such information from Milanowski in Interrogatories, but he invoked his constitutional rights and declined to provide the names of any of his creditors, the amount of their debts, etc.  Petitioners thus submit that they have met their burden of proof by establishing in excess of $100 million of debts that are not being paid, which is the converse of the "few unpaid debts" that the *Focus Media* court ruled would not satisfy the totality of the circumstances test.  In short, here, as in *Focus Media*, and unlike the two-party dispute in *Vortex* (where the debtor had been paying its debts, including an IRS obligation):

> The record does not depict a company with a few unpaid bills.  Instead, it depicts a company that had substantial amounts of unpaid bills and no plans or ability to pay them.

*Id.*, 378 F.3d at 929.

## CONCLUSION

After consideration of the evidence, Petitioners ask the Court to enter the order for relief.

Dated August 3, 2007.

**LEWIS AND ROCA LLP**

By /s/ Susan M. Freeman AZ 004199
      Susan M. Freeman *pro hac vice*
      SFreeman@LRLaw.com
      Rob Charles, NV 6593
      RCharles@LRLaw.com
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada  89169-5996
Facsimile: (702) 949-8321
Telephone: (702) 949-8320
*Attorneys for the USACM Liquidating Trust*

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1

2                                                                *and*

3                                      **BECKLEY SINGLETON, CHTD.**

4                                      /s/ Anne M. Loraditch  NV 8164
                                                Bob L. Olson
5                                                Anne M. Loraditch
                                       530 Las Vegas Boulevard South
6                                      Las Vegas, NV 89101
                                       *Attorney for USA Capital Diversified Trust Deed Fund,*
7                                      *LLC*

8                                                       and

9                                      **ORRICK, HERRINGTON &**
                                       **SUTCLIFFE LLP**
10                                     MARC A. LEVINSON
                                       JEFFERY D. HERMANN
11                                     400 Capitol Mall, Suite 3000
                                       Sacramento, California  95814-4497
12
                                       ATTORNEYS FOR POST-EFFECTIVE
13                                     DATE DTDF

14                                     **GREENBERG TRAURIG, LLP**

15                                     By /s/ Keriann M. Atencio AZ 020821
                                                Keriann M. Atencio *pro hac vice*
16                                     2375 East Camelback Road
                                       Phoenix, AZ  85016
17                                     Attorneys for Nevada State Bank

18                                     **NV HESPERIA INVESTORS, LLC**
                                       By: Ponderosa Asset Management, LLC
19                                     Its: Sole Manager

20                                     By: /s/ Lynn L. Fetterly
                                                Lynn L. Fetterly, Manager
21                                     P.O. Box 5986
                                       549 Ponderosa Avenue
22                                     Incline Village, Nevada 89450
                                       Telephone: (775) 832-2655
23                                     *In Proper Person*

24

25

26

27

28

LEWIS
AND
ROCA
—— LLP ——
L A W Y E R S

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP**
-and-
**BULLIVANT HOUSER BAILEY PC**

By: ___/s/ Georganne W. Bradley NV 1105____
       Georganne W. Bradley
3883 Howard Hughes Pkwy., Ste. 550
Las Vegas, NV 89169
*Attorneys for Petitioning Creditors Compass*
*Financial Partners LLC and Compass USA SPE LLC*

Copy of the foregoing
emailed this 4th day of
August, 2007 to:

Russell S. Walker
**Woodbury & Kesler, PC**
265 East 100 South
Suite 300
P. O. Box 3358
Salt Lake City, UT 84111
rwalker@wklawpc.com

Attorneys for Joseph D. Milanowski

{00412799;}

49

223740.7